Stephon M. JENKINS, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–721.

District of Columbia Court of Appeals.

Argued Sept. 17, 1992.
Decided Dec. 28, 1992.

M. Elizabeth Kent, Washington, DC, appointed by this court, was on the brief, for appellant.

Peggy Kuo, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Wyneva Johnson, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Appellant Stephon Jenkins ("Jenkins") was convicted of first-degree murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1989 & 1992 Supp.). On appeal, Jenkins contends: (1) that the decedent's statements to a police officer were improperly admitted at trial under the dying declaration exception to the hearsay rule of evidence, and (2) that the trial court denied him a meaningful opportunity to explore the bias of government witness Gary Murphy on cross-examination. For the following reasons, we affirm.

## I.

On the night of May 25, 1990, Metropolitan Police Department Detective Louis Perez was driving a police cruiser in the vicinity of Ninth and L Streets, Northwest. While stopped at a traffic light, he observed a man staggering about and bleeding profusely. After calling for an ambulance, Detective Perez approached the man, who had collapsed on the sidewalk. When asked what happened to him, the bleeding man replied, "Stephon stabbed me." In response to further questioning, he told the detective he was in great pain and that Stephon had taken his beeper and wallet. Finally, before lapsing into convulsions and losing consciousness, he identified himself as Anthony Lowery and gave his address. He later died without ever regaining consciousness. At trial, the government effectively rebutted appellant's alibi defense.

## II.

### Dying Declaration

Appellant maintains that the trial court erred by improperly admitting hearsay testimony that Mr. Lowery identified appellant as the man who stabbed him. The trial court denied Jenkins' *in limine* motion, and admitted the decedent's statement to Detective Perez as a dying declaration.

"To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States*, 290 U.S. 96, 99, 54 S.Ct. 22, 23, 78 L.Ed. 196 (1933), which may be perceived "from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could not survive; as well as his conduct at the time...." *Mattox v. United States*, 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). Accord *Lyons v. United States*, 606 A.2d 1354 (D.C.1992); *McFadden v. United States*, 395 A.2d 14, 16 (D.C.1978). Appellant argues, citing *Shepard, supra*, 290 U.S. at 100, 54 S.Ct. at 24, that Mr. Lowery lacked a "settled hopeless expectation" that his death was imminent when he spoke the fatal words implicating Stephon Jenkins, failing to speak "in the hush of [death's] impending presence."

At the threshold, it must be noted that we accord a trial judge's decision great deference on the "preliminary fact question of consciousness of impending death" where "reasonably supported by the evidence," *Butler v. United States*, No. 89–1149, slip op. at 23 (D.C. July 21, 1992) (quoting E. CLEARY, MCCORMICK ON EVIDENCE § 282 at 830, § 53 at 135 n. 4 (3d ed. 1984)). Here, this deference is warranted. The circumstances weighed by the trial court included evidence showing that Mr. Lowery had been stabbed ten times with a double-edged knife, penetrating both lungs, spleen, stomach, arms and back. In addition, he was bleeding profusely and staggering before he ultimately collapsed on the pavement. When coupled with Detective Perez's testimony that the decedent repeatedly emphasized that he was in pain, the trial court's conclusion that Mr. Lowery spoke with a sense of impending death is reasonably supported by the evidence. Considering that "there is no unyielding ritual of words to be spoken by the dying," *Shepard, supra*, 290 U.S. at 100, 54 S.Ct.

at 24, and that a "despair of recovery may indeed be gathered from the circumstances if the facts support the inference," *id.*, those statements identifying the appellant were not erroneously admitted.

### III.

*Curtailment of Bias Testimony*

At trial, the government presented the testimony of an eyewitness, Gary Murphy. On the evening of May 25, 1990, Mr. Murphy was working at Mack's Amoco station in the 800 block of M Street. According to testimony, Mr. Lowery, an acquaintance of Mr. Murphy, came to the station to buy chips and soda and to ask for change for the telephone. Murphy and Lowery talked for a few minutes, until Mr. Lowery went to use a nearby telephone. As Mr. Lowery was using the telephone, a car drove up. Appellant Jenkins, seated in the rear passenger seat, got out of the car and approached Lowery. Murphy overheard Jenkins ask Lowery for money that Lowery apparently owed Jenkins. Murphy then observed Jenkins put his left arm around Lowery's neck while the two walked a short distance together. Suddenly, Murphy noticed a knife in Jenkins' hand, and watched as Jenkins stabbed Lowery in the abdomen. Lowery fled with Jenkins in pursuit. Jenkins soon returned to the car and left.

On cross-examination, defense counsel sought to impeach Murphy's testimony, suggesting that Murphy testified against Jenkins in order to curry favor with the prosecutors. Testimony revealed that when Murphy testified regarding his knowledge in this case before the grand jury, he concealed his identity by using a false name. This was to avoid arrest for an outstanding bench warrant for failure to appear for sentencing on a charge to which he entered a guilty plea. Murphy's true identity was discovered at the office of the Assistant United States Attorney assigned to the instant case, where he was immediately arrested. Defense counsel successfully elicited from Murphy that despite the fact that his record indicated his voluntary surrender, he did not, in fact, turn himself

in voluntarily. However, when defense counsel attempted to elicit the charges underlying the bench warrant and the potential sentence, the government's objection was sustained. Undaunted, defense counsel then asked if the criminal charge to which he plead guilty "had to do with narcotics." The trial judge again sustained the government's objection, instructed the jury to disregard that question, and admonished defense counsel regarding his line of inquiry.

Appellant argues that the trial court, by disallowing further inquiry into the charge underlying Mr. Murphy's plea of guilty, violated his constitutional right to confront witnesses; he asserts that the error warrants reversal.

■ The proposition is well settled that fundamental to the Sixth Amendment is the guarantee that an accused in a criminal prosecution has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Noting that "[c]onfrontation means more than being allowed to confront the witness physically," *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), the Supreme Court has elaborated that "[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting 5 J. WIGMORE, EVIDENCE § 1395, at 123 (3d ed. 1940)) (emphasis in original). Central to this "essential purpose," cross-examination serves as a vehicle to uncover "possible biases, prejudices, or ulterior motives of the witness as they may relate to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110 (quoting 3A J. WIGMORE, EVIDENCE § 940, at 775 (Chabourne rev. ed. 1970)), and is "always a proper subject of cross examination." *Springer v. United States*, 388 A.2d 846, 855 (D.C.1978) (quoting *Hyman v. United States*, 342 A.2d 43, 44 (1975)). Moreover, cross-examination seeking to ferret out bias takes on enhanced significance where the credibility of the key government witness is in issue. See *In re*

*C.B.N.*, 499 A.2d 1215 (D.C.1985); *Benjamin v. United States*, 453 A.2d 810, 811 (D.C.1982).

We must note, however, that the probative value of impeachment does not vest an examining attorney with an unbridled license. "[The] extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Mitchell v. United States*, 408 A.2d 1213, 1214 (D.C.1979) (quoting *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)). It is well within the province of the trial court to limit cross examination to "prevent harassment, prejudice, confusion of the issues or repetitive, cumulative, or only marginally relevant questioning, to avert danger to or the humiliation of a witness, or [t]o guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989).

In the case at bar, defense counsel freely explored several avenues seeking to impeach Mr. Murphy. He successfully elicited Mr. Murphy's use of a false name before the grand jury to avoid arrest, his failure to appear for sentencing, and his questionable "voluntary" surrender to the authorities. In addition, counsel implied that Mr. Murphy's sentencing date may have been postponed to allow the sentencing judge to favorably consider any assistance to the prosecution rendered in this action. In fact, the only area foreclosed was the exact nature of the crime underpinning Mr. Murphy's sentencing.

■ Therefore, our initial inquiry is whether the judge erred in curtailing that testimony. We hold that this was error because, in doing such, the jury was without knowledge if the crime committed carried a significant sentence which might induce Mr. Murphy to shade his trial testimony to curry the government's favor in the future. Guilty pleas prior to sentencing are not convictions in this jurisdiction, and are generally not proper subjects for impeachment cross-examination. *Langley v. United States*, 515 A.2d 729, 734 (D.C. 1986) ("... final appealable judgment of conviction means the sentence"). However, they may be properly explored in most bias inquiries and, even where the trial court has allowed counsel to explore at will the potential ulterior motives of a witness, yet refuses one potentially inflammatory area, an error has occurred.[1] Defense counsel was, therefore, justified in attempting to explore this potential bias, especially considering that Mr. Murphy was the key prosecution witness.[2]

■ Our finding of error, however, does not conclude our inquiry. In *Springer v. United States, supra*, 388 A.2d at 856, we carefully laid out a blueprint for review:

We will first examine the record to determine whether any such error committed is of constitutional dimension—i.e., whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation. Where examination of the record shows that the trial court's curtailment of cross-examination rises to the level of abridgment of the defendant's constitutional right to effective cross-examination, we must then decide whether such constitutional error by the trial court is of such magnitude as to require reversal *per se*[3]

1. While the record does not indicate the trial court was aware of the charge in question, public records reveal that Mr. Murphy had pled guilty to attempted distribution of heroin. In the past, we have "recogniz[ed] the 'highly inflammatory nature' of drug activity allegations and the ... 'propensity to mislead the jury or confuse them.'" *Ford v. United States*, 549 A.2d 1124 (D.C.1988) (citations omitted).

2. Appellees' proffer, that no deal was arranged for Mr. Murphy's testimony, is of little consequence in that "[i]t is the jury, not the judge, witness, and prosecutor, which must assess whether a pending charge has colored an individual's testimony." *Washington v. United States*, 461 A.2d 1037, 1038 (D.C.1983).

3. *Per se* error was effectively overruled in *Delaware v. Van Arsdall, supra*, 475 U.S. at 683–84, 106 S.Ct. at 1437–38.

or whether such error may be considered harmless beyond a reasonable doubt. (Citations omitted.)

Whether the curtailment of a single line of inquiry going to the issue of underlying crime is of "constitutional dimension" requires a "showing that [appellant] was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *Van Arsdall, supra*, 475 U.S. at 680, 106 S.Ct. at 1436 (citing *Davis v. Alaska, supra*, 415 U.S. at 318, 94 S.Ct. at 1111). In *Davis*, the trial court, while permitting general impeachment inquiry, issued a protective order prohibiting defense counsel from questioning a key government witness regarding his juvenile burglary adjudication as well as subsequent probation status at time of trial. Davis' counsel maintained that he was not intending to introduce the aforementioned evidence to implicate the witness' veracity but rather to show that, given his probationary status, he may be seeking to curry favor with the government causing him to misidentify the petitioner. *Id.* at 311, 94 S.Ct. at 1108. The Supreme Court, acknowledging the state's "important interest in protecting the anonymity of juvenile offenders," *id.* at 319, 94 S.Ct. at 1111, nonetheless held that "[w]hile counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318, 94 S.Ct. at 1111.

Likewise, in the case before us, defense counsel was permitted certain latitude in establishing that Murphy had pled guilty to some crime and his sentencing date had been postponed. However, in disallowing the jury to hear what the underlying charge was, the court precluded the jury from "appropriately drawing inferences relating to the reliability of the witness." *Van Arsdall, supra*, 475 U.S. at 680, 106 S.Ct. at 1435. Moreover, the trial court was not faced with navigating through the competing tensions presented to the trial court in *Davis*. There is no evidence that Mr. Murphy was entitled to any special statutory protections as a result of his juvenile status, either at the time he committed the crime or at trial. Therefore, we find the aforementioned error of constitutional significance, requiring analysis under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[4]

Under *Chapman*, "it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." *Scull v. United States*, 564 A.2d 1161, 1166 (D.C.1989) (quoting Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska*, 73 MICH. L.REV. 1465, 1473 (1975)) (footnote omitted). *See In re C.B.N., supra*, at 1221; *Goldman v. United States*, 473 A.2d 852, 857 (D.C.1984). In applying this test we consider "a host of factors, all readily accessible to reviewing courts ... including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course the overall strength of the prosecution's case." *Van Arsdall, supra*, 475 U.S. at 684, 106 S.Ct. at 1438. Mr. Murphy's account of the events was confirmed by the

---

4. *Davis* and its progeny implicitly stand for the proposition that a determination whether a curtailment of bias inquiry triggers constitutional consideration cannot be made by simply adhering to a numerical scheme whereby we tally what the trial judge allowed and what he prohibited. Rather, it is a qualitative determination. However, where a determination has been made that a defendant's right to confrontation has been "abridged," the concern relates, of course, to the nature of the testimony excluded rather than the number of questions sought to be asked.

physical evidence, which included the medical examiner's testimony describing the wounds; the double-edged dagger found near the scene; Detective Perez's testimony recounting his observations of a man bleeding, stumbling and lapsing into unconsciousness; as well as Mr. Lowery's statement that "Stephon stabbed me." Considering the corroborating evidence and the extent of cross-examination permitted, and the general strength of the prosecution's case, we find the trial court's error harmless.

Accordingly, we affirm the judgment.

FARRELL, Associate Judge, concurring:

I join the court's opinion except that I would not reach the issue whether, in the context of the cross-examination that was allowed, the error in prohibiting inquiry about "the exact nature of the crime underpinning Mr. Murphy's sentencing," *ante* at 532, rose to the level of a constitutional violation. Even assuming it did, the error was harmless, as the court holds.