Michael L. SOTHERN, Appellant

v.

UNITED STATES, Appellee.

Nos. 95–CF–175, 97–CO–534.

District of Columbia Court of Appeals.

Argued March 5, 1998.

Decided Aug. 3, 2000.

David Carey Woll, Wheaton, MD, appointed by the court, for appellant.

Ann L. Rosenfield, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.*

TERRY, Associate Judge:

Following a four-day jury trial, appellant was convicted of one count of kidnapping, two counts of rape, three counts of sodomy, and one count of assault with intent to commit sodomy. Several months after he was sentenced, he filed in the trial court a motion to vacate his sentence under D.C.Code § 23–110 (1996), asserting that his trial counsel had rendered ineffective assistance. The trial court denied that motion without a hearing, and appellant noted an appeal from that ruling, which we consolidated with his earlier appeal from the conviction. Before us appellant's main contention is that the court erred in rejecting his claim of ineffective assistance of counsel and that it should, at the very least, have held a hearing on his motion; secondarily, he argues that the court erred during the trial in refusing to allow him to cross-examine the complaining witness about her recent arrest in order to show bias. We affirm both the judgment of conviction and the denial of the § 23–110 motion.

I

Briefly summarized, the government's evidence showed that the complainant, S.C., a twenty-five-year-old drug user, went up to the doorway of a house on 14th Street, N.W., where appellant Sothern was standing, and asked him if he could sell her $10 worth of crack cocaine.[1] Almost immediately, the door opened, and Major Lee Mattison came out of the house. Mattison pulled S.C. toward him, while Sothern assisted by pushing her inside. S.C. was then taken to the basement, where for the next three hours she was subjected to numerous sexual assaults by the two men.[2] Finally, she was allowed to use the bathroom, and when she came out of the bathroom, she asked Sothern if she could leave. Sothern gave her back her clothes and escorted her upstairs and out the front door.

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

1. S.C. knew appellant as "Mike" and had been told by someone else that he was a seller of drugs.

2. Mattison, charged as a co-defendant along with Sothern, pleaded guilty to one count of sodomy and one count of attempted rape and was sentenced before Sothern's trial began.

Although she was in considerable pain, she managed to flag down a passing police car. The officer to whom she told her story summoned an ambulance and also radioed for assistance from the Sex Offense Branch. A few minutes later, a detective arrived and took a statement from S.C. in which she described her assailants and said that one of them was named Mike. She was then taken to a hospital and examined by a physician. Three days later she identified Sothern from an array of photographs.

Then, approximately three weeks after the crime, S.C. saw Sothern on the street and immediately ran to a parked police car, where she told the officers inside that she had been raped "and the person that raped me is across the street leaning on the fence." By that time Sothern had disappeared, so she got into the car and began to ride around with the officers, looking for him. After a few moments, S.C. saw Sothern standing on a corner talking with Mattison, and she exclaimed, "Oh, my God, that's the other person that raped me also." The two officers jumped out of the car and arrested both men. A later search of the basement of the 14th Street house yielded corroborative physical evidence that a sexual assault like that described by S.C. had taken place, though there was no physical evidence linking Sothern with that assault. The government did establish, however, that Sothern lived in the house and that he had access to the basement, even though his room was on the second floor.

At the beginning of the defense case, Sothern's counsel told the court that he wanted to call Mattison as a witness, but that Mattison refused to testify. After the court explained to Mattison that he no longer had a Fifth Amendment privilege because he had already pleaded guilty and been sentenced, he testified that S.C. had had consensual sex with both Sothern and himself.[3] Sothern then testified, however, that S.C. had voluntarily had sex with Mattison as payment for $50 worth of crack cocaine, and that he (Sothern) was not involved in any sexual activity with S.C.

## II

■ Sothern's § 23–110 motion, supported by his own affidavit, raised four claims of ineffective assistance of counsel. The government filed an opposition accompanied by affidavits from Sothern's trial counsel and from the prosecutor. The court, after considering all of these documents, denied the motion without a hearing in a ten-page order which considered and rejected each of appellant's claims. We are in substantial agreement with that order and with the court's reasoning. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a convicted defendant claiming ineffective assistance of counsel must make a two-part showing: first, that counsel's performance was deficient, and second, "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. We agree with the trial court that Sothern's motion failed to meet the *Strickland* test, and that he was therefore not entitled to relief or even to a hearing.

■ Sothern's principal assertion was that counsel had been ineffective in calling Mattison as a witness (even though Sothern knew well in advance that counsel planned to do so). The court concluded:

It is noteworthy that if the jury had credited Mr. Mattison's version of events (namely, that the entire encoun-

---

3. This was inconsistent with defense counsel's opening statement, in which counsel had said:

[S.C.] went to [the house on] 14th Street to purchase drugs. She contracted with Mr. Major Mattison for that purpose. An agreement was worked out, exchanging drugs for sex, an agreement Mr. Sothern had nothing whatsoever to do with. Mr. Mattison engaged in sex, and at one point, you will hear his testimony . . . [S.C.] decided she did not want to continue. Mr. Mattison continued, which forms the basis of his rape of [S.C.], something Mr. Sothern had nothing to do with whatsoever.

ter was consensual), defendant likely would have been acquitted on all charges. This can hardly be considered deficient representation.

It was only after Mattison finished testifying that inconsistencies developed between his testimony and that of Sothern, who followed him to the stand. As the trial court observed, "When defendant elected to testify, he knew the state of the evidence and assumed the risk of presenting additional inconsistencies for the jury." Thus any prejudice flowing from Mattison's testimony is directly attributable to Sothern, not his counsel. While Mattison's testimony was not particularly helpful to the defense, it did not make a significant difference in the outcome of the case, because the government's evidence was strong, and Sothern himself was largely responsible for any weakness in the defense.

Reduced to essentials, Sothern's argument is that his counsel was ineffective because Mattison's testimony was different from what counsel said it would be in his opening statement (see note 3, *supra*). Counsel had told the jury that Mattison would testify that Sothern never had sex with S.C., and that the sex-for-drugs arrangement involved Mattison only. When Mattison took the stand, however, he said that Sothern was also involved in the sex-for-drugs deal and that both men had consensual sex with S.C. The trial court, addressing this inconsistency, said in its order:

> It appears that [counsel] may have been surprised by Mr. Mattison's testimony that defendant began to have sex with the complainant. However, this does not mean that his representation was deficient.

Referring to counsel's affidavit, the court outlined the steps counsel had taken in deciding whether to call Mattison as a witness, then interviewing Mattison and discussing his anticipated testimony with Sothern. After noting that the inconsistency "became apparent only when defendant chose to testify after the conclusion of Mr. Mattison's testimony," the court concluded that counsel's "decision to call Mattison as a witness falls squarely into the category of tactical decisions" which counsel are often called upon to make in the course of a trial, and ruled that it would not "assess in hindsight whether a particular action was appropriate," citing *McKinnon v. United States*, 644 A.2d 438, 444 (D.C.), *cert. denied*, 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994) ("tactical decisions which may go awry at trial do not constitute ineffectiveness"). We are satisfied that the trial court ruled correctly and that, as the government states in its brief, Sothern is blaming his lawyer "for nothing more than a strategic choice gone sour." *See Curry v. United States*, 498 A.2d 534, 540 (D.C.1985); *see also Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (rejecting ineffective assistance claim on similar facts).

■ Sothern's other main complaint is that his attorney allegedly failed to communicate to him a plea offer from the government, which he said in his motion that he "probably" would have accepted. The record makes clear, however, that Sothern wanted the same deal that Mattison had received, and that the government was not willing to make that same offer to Sothern because it regarded him as the more culpable of the two defendants, and because Sothern also had other pending charges, including two murders.[4] Thus there is no substance to Sothern's argument about the supposed plea offer be-

---

4. The prosecutor said in his affidavit that he "considered Sothern to be a predator, one of the most dangerous individuals I prosecuted as an AUSA [Assistant United States Attorney] in the District of Columbia.... I would not have extended the same plea offer to him that I extended to Mattison." The prosecutor made clear that he would not agree to any "package deal" unless Sothern would plead guilty to a homicide, which Sothern refused to do.

cause no such offer was or would have been made.

■ Sothern also contends that his lawyer was ineffective in failing to offer evidence that one of three semen stains on the victim's clothing could not be attributed to him. The other two stains, however, were unusable, so that the FBI could not analyze them at all. Counsel said in his affidavit that he chose not to develop evidence on this point because, even without it, he could and did argue that the government had no physical evidence to link Sothern to the crime. The fact that one of the three stains was not attributable to Sothern was not clearly exculpatory when the other two stains could not be tested. We find no ineffective assistance in counsel's decision not to present inconclusive evidence.

■ Finally, Sothern argues that his counsel was ineffective in failing to call Fred Hollinshed, another resident of the house, as a witness. Counsel stated in his affidavit, however, that he chose not to call Mr. Hollinshed because he could have given additional inculpatory evidence about Sothern's access to the basement. The trial court said: "This decision is clearly within the range of competent tactical decisions, especially given the fact that Mr. Hollinshed had no information about what happened on the day in question, and could have been impeached based on his close relationship with [Sothern]." We agree with the trial court. *See Terrell v. United States,* 294 A.2d 860, 864 (D.C.1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1973); *Scott v. United States,* 259 A.2d 353, 354 (D.C.1969).

### III

■ As for the direct appeal, Sothern's only contention is that the trial court erred in refusing to permit his counsel to cross-examine S.C., the complainant, about her arrest for sexual solicitation while the case against him was pending.[5] Counsel's only stated purpose was to expose possible bias on S.C.'s part. The trial court held, however, and we agree, that such cross-examination would have been irrelevant. We also observe that defense counsel had sufficient opportunity to explore S.C.'s bias in other respects in the course of his cross-examination. We therefore find no abuse of discretion in the court's ruling. *See Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989) (trial court has discretion to limit cross-examination in order to "prevent harassment, prejudice ... or only marginally relevant questioning"); *see also Brewer v. United States,* 559 A.2d 317, 320–321 (D.C.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990); *McLean v. United States,* 377 A.2d 74, 78 (D.C.1977).

Our decision in *Jenkins v. United States,* 617 A.2d 529, 532 (D.C.1992), is of no help to Sothern. In *Jenkins,* a murder case, defense counsel was prohibited from cross-examining the key government witness as to the nature of the offense to which he had previously pleaded guilty. We held that this ruling was error because it kept the jury from learning whether the potential sentence, which had not yet been imposed, was so substantial that it might have induced the witness to shade his trial testimony in the hope of currying favor with the government. In this case, however, the maximum penalty that S.C. faced, as a first offender, was a $300 fine. *See* D.C.Code § 22–2701(a) (1996). The trial judge, after concluding that the probative value of disclosing the nature of the offense charged—soliciting for prostitution—was outweighed by the prejudice to the government,[6] ruled that defense counsel

**5.** The solicitation charge was eventually dropped. The prosecutor told the court that "when her case finally came up for trial, apparently, it was dismissed for want of pros-

ecution, and I can only assume the officer involved in the case did not show up."

**6.** *See, e.g., Jones v. United States,* 625 A.2d 281, 284 (D.C.1993) ("Although relevant, evi-

could not mention the actual charge, but explicitly gave counsel permission to elicit the penalty (thereby eliminating any *Jenkins* issue). Counsel, however, chose not to do so.[7]

## IV

The judgment of conviction and the denial of appellant's motion to vacate sentence under D.C.Code § 23–110 are both

*Affirmed.*

RUIZ, Associate Judge, dissenting:

It is difficult for me to conclude on the present record, without benefit of a hearing, that defense counsel's decision to call Mattison as a witness was not deficient. If defense counsel's performance was deficient, relief is warranted because the record supports the conclusion that there was resulting prejudice under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But for Mattison's testimony, this case came down to a credibility contest between the complaining witness, who was impeached as a drug abuser, and the appellant. Although there was physical evidence that a sexual assault had occurred in the basement of the house where Sothern lived on the second floor and that the complaining witness had been injured, there was no physical evidence that linked appellant to that assault. When Mattison testified on direct, however, he said that appellant had done a sex-for-drugs deal with the complaining witness, engaged in sex with her and had then encouraged Mattison to participate as well. This testimony not only was directly contradictory to the defense that trial counsel announced during opening argument, that appellant had not engaged in any sex at all with the complaining witness, but it also corroborated part of the complaining witness' testimony and established that appellant possibly had a key to the basement. Moreover, the government's cross-examination of Mattison completely devastated his story that whatever sex had occurred was consensual because Mattison was effectively impeached with his plea hearing testimony that the complaining witness "was scared and frightened," that the sex was against her will, and that Mattison left the scene because something "wrong" was going on in the basement involving what Sothern was doing to the complaining witness. The government effectively cross-examined Mattison as to his unwillingness to incriminate appellant, even though Mattison had already plead guilty and been sentenced, because, as Mattison stated, a "snitch" is someone "who dies very quickly." During closing argument, defense counsel asked the jury to consider that the "only" evidence against Sothern was the complaining witness, who was bent on revenge for a drug deal gone wrong, but that her revenge should be directed against Mattison, because "the Government has woefully failed to show any connection that [Sothern] had." Not surprisingly, in rebuttal the government took advantage of counsel's question and answered it for the jury: "Is there evidence that [Sothern] was involved? Sure, there was, ladies and gentlemen. And it didn't just come from Government witnesses. It came from the defense's own witness, Mr. Major Lee Mattison." Therefore, I cannot conclude that Mattison's testimony did not seriously prejudice appellant. *See Strickland,* 466

dence may be excluded if its potential for prejudicial misuse by the jury substantially outweighs its probative value"); *see also McLean, supra,* 377 A.2d at 79 (evidence of rape victim's prior sexual acts has no relevance to her credibility and therefore should not be admitted, "except in the most unusual cases where the probative value is precisely demonstrated and outweighs the prejudicial effect of the testimony" (footnote omitted)).

7. Appellant offered no theory, other than bias (*i.e.,* the notion that S.C. might have altered her testimony in an effort to curry favor with the government), which might support his assertion that he should have been allowed to prove the actual charge for which S.C. was arrested. Nor has he done so on appeal. Thus we do not consider whether the fact that S.C. was arrested for sexual solicitation might have been relevant for any other reason.

U.S. at 696, 104 S.Ct. 2052 ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors").

I also do not think that the prejudice from Mattison's testimony can be laid at the feet of the appellant, as suggested by the trial court and the majority on appeal. Inconsistencies between the testimony of appellant and Mattison are not the appellant's "fault." To state otherwise suggests that Sothern should have "conformed" his testimony to Mattison's version, even if appellant believed it was untrue. Moreover, Sothern's testimony was not the first inconsistency between the defense case and Mattison's version of events; a lot of harm had already been done before Sothern testified because, during opening argument, defense counsel had vouched for Mattison's credibility and had previewed Mattison's testimony for the jury: that it was he, not appellant, who had engaged in sex—consensual or otherwise—with the complaining witness, and that it was "something Mr. Sothern had nothing to do with whatsoever." When Mattison testified on direct, however, he stated that Sothern engaged in sex with the complaining witness first and then encouraged Mattison to do so as well; and during cross-examination, Mattison's testimony went further, clearly incriminating Sothern in rape and kidnaping.

Even though there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, the reasonableness of defense counsel's performance in deciding to call Mattison to testify at trial requires careful scrutiny as it was determinative of the § 23–110 motion in light of the strong prejudice that resulted from Mattison's testimony. The trial court reasoned that defense counsel's performance was not defective because he had a good reason to call Mattison to rebut the kidnaping charge and, after interviewing Mattison pre-trial, was satisfied that he would not incriminate Sothern in the rape.[1] The trial court commented that "if the jury had credited Mr. Mattison's version of the acts (namely that the entire encounter was consensual), defendant would have been acquitted on all charges." This view is too rosy to be accepted without inquiry, for Mattison's version of a consensual sexual encounter was on its face subject to serious doubt by the jury, which had been informed that he had plead guilty to sodomy and attempted rape as a result of that encounter. Apparently, defense counsel also expected that, by limiting the direct examination, he could prevent the government from eliciting the damaging testimony that came out during its cross-examination of Mattison. The government's cross-examination of Mattison, however, was clearly within the scope of direct examination, *i.e.*, the events on the day of the rape. Under *Strickland*, deference to trial counsel's reasonable tactical decisions is required; bowing to a call which on its face is mere wishful thinking, is not.

In the order denying the § 23–110 motion, the trial court relied on the statement in defense counsel's affidavit that appellant insisted that Mattison be called as a witness, even after counsel had conveyed his misgivings about calling Mattison to the

---

1. Defense counsel's affidavit submitted by the government in opposition to Sothern's § 23–110 motion is very carefully worded on this issue, stating that

    It was my opinion that [Mattison] would make a reasonably credible witness for the defense and would not testify that [Sothern] ever had sex with [the complaining witness] *against her will.*

(Emphasis added.)

Counsel is correct that consensual sex would not have *incriminated* appellant, but it certainly contradicted counsel's opening argument that Sothern "had nothing to do with" sex with the complaining witness and, presumably, undermined the defense's credibility.

stand.[2] Appellant disputes in his affidavit that counsel told him how Mattison's testimony could hurt him.[3] As there was no hearing conducted to resolve this material factual dispute, and neither affidavit is incredible on its face or in the context of other evidence of record, the trial court could not rely on one affidavit over another. Nor can we, for to do so is to engage in the type of appellate fact-finding that this court has regularly eschewed as outside its province in the allocation of judicial authority. *See Dickerson v. United States*, 677 A.2d 509, 511–12 (D.C.1996) ("It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding."); *Speyer v. Barry*, 588 A.2d 1147, 1156 (D.C. 1991) ("appellate courts are not equipped for fact-finding"). We both require and defer to the fact and credibility findings of trial judges precisely because it is within their province to hold evidentiary hearings and assess a witness' demeanor in making such findings. *See In re S.G.*, 581 A.2d 771, 775 (D.C.1990) ("This court may not usurp the prerogative of the judge, as the trier of fact, to determine credibility...."); *Davis v. United States*, 564 A.2d 31, 40 (D.C.1989) (noting "general principle that appellate courts should defer to the trier of fact because, as a functional matter, the trier of fact is better positioned to make such findings").

The statute provides that "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall grant a prompt hearing thereon." D.C.Code § 23–110(c) (1996 Repl.). Here, the motion and trial record raise troubling questions about counsel's performance. It may be that, supported by counsel's reason to call Mattison to rebut the kidnaping charge and the assertion in trial counsel's affidavit that he interviewed Mattison and was satisfied that he would not incriminate appellant, the decision to call Mattison properly can be characterized as a reasonable tactical decision, though certainly not one without risk as the ensuing trial proved. *See McKinnon v. United States*, 644 A.2d 438, 444 (D.C.), *cert. denied*, 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994) (noting "tactical decisions which may go awry at trial do not constitute ineffectiveness") (quoting *Carter v. United States*, 475 A.2d 1118, 1123 (D.C.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985)). But where the issue of deficient performance is so close, the trial court relied on material facts that are disputed on the written submissions, and the prejudice to appellant was serious, the trial court must hold a hearing.

I would reverse and remand for a hearing.

---

2. Defense counsel's affidavit states:

Prior to presenting the testimony of Mr. Mattison I discussed with defendant that I was concerned about what Mattison would say took place in the basement. I knew Mattison would state that the sex was consensual, and that he—Mr. Mattison, had had sex with her. I told defendant about my concerns but defendant was adamant that he wanted Mattison to testify.

3. Appellant's affidavit states:

I had no idea what Mr. Mattison's testimony would be and my lawyer never told me. If I knew beforehand what his testimony would be, I would never have wanted him to testify on my behalf.