**Jamelle McCLARY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 07–CF–1154.**

District of Columbia Court of Appeals.

Argued April 27, 2010.
Decided Sept. 2, 2010.

---

348

Sloan S.J. Johnston, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

Stratton C. Strand, Assistant United States Attorney, with whom Channing D. Phillips, United States Attorney, Roy W. McLeese III, and Michael T. Truscott, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, KERN and NEBEKER, Senior Judges.

NEBEKER, Senior Judge:

After a jury trial presided over by Judge Dixon, appellant was convicted of assault with intent to kill while armed (AWIKWA), aggravated assault while armed (AAWA), assault with a dangerous weapon (ADW), three counts of possession of a firearm during commission of a crime of violence (PFCV), carrying a pistol without a license (CPWL), possession of an unregistered firearm, and unlawful possession of ammunition.[1] He argues on appeal that the court erred by limiting his cross-examination of the victim for bias, by giving an "attitude and conduct of the jury" instruction, and in failing to merge the AAWA and AWIKWA charges, the AAWA and ADW charges, and the three counts of PFCV. We affirm the convictions except with respect to the counts of PFCV, which merge, and AAWA and ADW, which also merge.

## I.

Sean Grady, sixteen years-old on August 7, 2006, testified that on the night of that date, he had been on Livingston Road selling crack cocaine, when appellant, whom he had seen in the neighborhood a couple of times, approached him and asked him, "Nigga, was there a problem?" Grady responded, "no, Nigga, there's no problem." Grady then "smack[ed]" his teeth, making a "ssst" sound because he thought appellant was "faking" or acting "big." Appellant pointed a gun at Grady's face and began firing. Appellant fired at least seven shots at Grady, hitting him under the nose, in the right cheek, neck, arm, chest, and twice in the back. Grady hesitated for a moment after appellant began shooting him, and then ran towards a gate, but could not make it because he "lost [his] energy." He turned around and ran past appellant toward the school, in an attempt to get away from him. As he ran toward the school, Grady hopped over a gate, and continued to run until he "passed out" by the school, where he remained for a few hours before he was brought to the hospital.

On the evening of August 7, 2006, Hugh Chandler and Rene Paige were sitting in lawn chairs outside an apartment complex at 4628 Livingston Road, Southeast, "talking, having some drinks[.]" Chandler had known appellant for about a year, and saw him frequently in the neighborhood. At approximately 10:30 p.m., Chandler and Paige saw a fifteen- to seventeen-year-old boy, later identified as Grady, who told Paige he was looking for two of his friends and then entered the middle building of the apartment complex. A few minutes later, Chandler saw appellant standing next to a car on Livingston Road along with several other men. Chandler saw appellant raise his right arm straight out from his chest and fire in Grady's di-

1. D.C.Code §§ 22–401, –4502; §§ 22–404.01, –4502; § 22–402; § 22–4504(b); § 22–4504(a); § 7–2502.01(a); § 7–2506.01(3). The charging document cites D.C.Code §§ 22–404.1, –4502 for the count of AAWA. This appears to have been a typographical error, as the corresponding code section for AAWA is § 22–404.01.

rection. Appellant was about ten to twelve yards from Chandler and was illuminated by several street lights. Chandler could not see the gun itself, but he saw the flashing from the gun's muzzle. He could not see whether the boy had been hit. Paige similarly reported having a "clear view" of appellant, who was illuminated by a street light, and of the "fire" coming from his gun.

After the shooting, Paige went inside to her apartment and Chandler remained in his lawn chair outside. Appellant and the other men disappeared into the parking lot, reappeared, got into a car, and sped off. Chandler assumed Grady had not been shot and did not call the police because he observed Grady run out from the parking lot, jump the school fence, and run behind the school. A few hours later, while walking to a friend's house to retrieve a jacket, Chandler walked behind the school and observed Grady lying on the ground moaning. He then went to a nearby gas station where he informed a police officer that there was a shooting victim behind the school.

Prior to trial, which began on June 7, 2007, appellant asked the court to discuss the extent to which the defense could cross-examine Grady for bias regarding "the complainant's juvenile record and ongoing cooperation with the government" and "juvenile adjudications"—including the fact that Grady was on probation and had an outstanding custody order on the night of the shooting, that he violated his probation by selling drugs that night, and that he had been arrested two days earlier for possession of marijuana and driving an

unregistered automobile.[2] Defense counsel argued that, under *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), inquiry was necessary on these topics to demonstrate Grady's bias towards the government due to his ongoing relationship with the government. The trial court denied defense counsel's request to cross-examine Grady regarding his juvenile cases, probation, and custody order. The court stated that the present case differs from *Davis,* where the witness had reason to be concerned that he might be charged with the same charges facing appellant, and therefore had more reason to be biased. In regard to the pending traffic charge and "no papered" drug possession charge, the Assistant United States Attorney stated that he had not been in contact with Grady while decisions were being made whether to paper these cases and that he was not involved in these cases, and "to his knowledge," no one representing the United States had told Grady there would be any connection between the cases. The trial court ruled that it did not consider inquiry about the new arrest to be relevant, but that the defense counsel would "still have the chance to make [the] argument" as to why it was an appropriate line of questioning.[3]

On June 11, prior to Grady taking the stand, defense counsel requested that the court permit them to file a "Supplemental Memorandum of Law on the Scope of Defendant's Right to Cross–Examine Complaining Witness" in the court jacket, "just ... for the record." In the memorandum, appellant argued that he should be allowed

**2.** On June 7, the government informed defense counsel of Grady's arrest and that the "adult traffic charges [are] being papered against him" but that the "marijuana charge ... is being no papered."

**3.** Juvenile prosecutions are not prosecuted by the United States; they are matters for the Attorney General of the District of Columbia. That independent prosecutorial authority may well be considered less likely to pose a bias concern than Grady's relationship with the United States Attorney.

to cross-examine Grady about (1) his juvenile record (charges for robbery, theft, and burglary), (2) his receipt of probation and probationary status at the time of the shooting, at the time of his testimony before the grand jury, and at the time of his identification of appellant to the police, (3) his outstanding custody order at the time of the shooting for failure to appear in court, (4) his engagement in illegal activity (drug-selling) on the evening he was shot, (5) his arrest for possession of marijuana and driving an unregistered automobile at the time of trial, and (6) the involvement of one of the Assistant United States Attorneys prosecuting the present case with a previous juvenile hearing in which Grady was involved. The trial court subsequently asked counsel if they wished to raise any issues orally; counsel for the government responded by noting concerns about the accuracy of the memorandum. Defense counsel did not respond to the trial court's inquiry.

At trial, appellant elicited from cross-examination of Grady that (1) he was testifying pursuant to an immunity agreement, (2) on the night of the shooting, he was selling crack cocaine, (3) he initially gave a false name and refused to cooperate with the police, and (4) the government had not charged him criminally for selling crack cocaine on the night of the shooting. Appellant presented evidence of a stipulation that Grady told the prosecutor that he took Ecstasy on the day of the shooting. Appellant also presented evidence of Gra-

dy's immunity agreement, and the court provided an "immunized witness" instruction to the jury.[4] *See* Criminal Jury Instructions for the District of Columbia, No. 2.204 (5th ed. rev. 2009).

## II.

### *Bias Cross–Examination*

Appellant contends that he was denied his constitutional right to confront a witness against him by the limitations imposed on his cross-examination of Grady. We first address the government's argument that appellant failed to raise some of the topics for cross-examination properly and therefore cannot raise them on appeal.

*Waiver*

■ The government argues that appellant failed to raise the issue of bias cross-examination with respect to the alleged involvement of one of the Assistant United States Attorneys prosecuting appellant's case (Mr. Osborne) in Grady's juvenile case because defense counsel did not provide supporting argument of it until the supplemental memorandum, and defense counsel's oral representations indicated that they wished to file the memorandum in the court jacket "just ... for the record." We agree that appellant failed to adequately raise the issue of Mr. Osborne's alleged involvement with Grady's juvenile case such that the trial court had an opportunity to rule. The record reveals that the court discussed the issue at a pre-

---

4. The court provided the instruction:
   You've heard evidence that a witness has received immunity. What this means, is that the testimony of the witness may not be used against him in any criminal case.
   You should consider whether such testimony may be colored in such a way as to further the witness's own interest[,] for a witness who realizes that he may receive a benefit or avoid prosecution by incriminating another may have a motive to lie; however, you may also consider that the witness *is under the same obligation to tell the truth* as is any other witness, because the grant of immunity does not protect him against a prosecution or perjury or a false statement should he lie under oath. The testimony of a witness as to whom immunity has been granted should be received with caution and scrutinized with care. You should give the testimony such weight as in your judgment it is fairly entitled to receive.

trial hearing on June 4. The Assistant United States Attorney present on June 4, represented to the court that Mr. Osborne did not speak with Grady and that he was present at the juvenile hearing for the purpose of ensuring Grady's safety and availability to testify in the present case. The court stated that it would review Grady's juvenile records in camera to determine whether Mr. Osborne participated in an adjudication hearing. The court also encouraged defense counsel to order a transcript from the juvenile hearing. On June 6, defense counsel told the court they expected to receive the transcript of the adjudication hearing and, should anything arise from it, reserved the right to raise the issue the next day. Defense counsel did not raise the issue again until they filed the supplemental memorandum. Such a memorandum, filed "just ... for the record" and with regard to which counsel declined to make an oral representation when asked, did not sufficiently raise the issue such that the trial court could issue a decision. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (to make out a Confrontation Clause violation, defendant must show that he was "prohibited from engaging in otherwise appropriate cross-examination"); *Slye v. United States,* 602 A.2d 135, 139 (D.C.1992) ("since the trial judge's discretion was never invoked, we cannot say that it was abused"). Indeed to hold otherwise permits counsel to set a trap to be sprung in appeal.

■ The government argues that appellant similarly failed to preserve the issue of cross-examination pertaining to Grady's probationary status, his recent arrest, and his mother's desire to have his probation revoked because defense counsel did not request a final ruling on these matters. At the June 7 hearing, defense counsel asked the court to consider whether they could cross-examine Grady about his probationary status and outstanding custody order on the night of the shooting, his violation of probation by selling drugs the night of the shooting, and his probationary status at the time of his identification of appellant. In the same colloquy with the court, appellant also raised the issue of Grady's probationary status at the time of the trial and the significance of his recent arrest.

Although the trial court at first stated that defense counsel "will still have the chance to make the argument" for why they should be allowed to cross-examine Grady about the new arrest, by the end of the discussion the court "den[ied] Defendant's request to cross-examine" Grady about the juvenile cases and denied appellant's motion for reconsideration. Thus it is clear from the court's ruling that it prohibited appellant from cross-examining Grady about his probation and custody order, violation of probation by selling drugs on the night of the shooting, and recent arrest. The court issued a final ruling on these matters and therefore appellant can, on appeal, raise the issue of their exclusion from bias cross-examination of Grady. In contrast to the rest of the probation and juvenile matters, the record reveals that appellant did *not* raise the issue of his mother's desire to have probation revoked until the supplemental memorandum that defense counsel filed "just ... for the record[.]" As we discussed in relation to Mr. Osborne's involvement in a juvenile hearing, this did not sufficiently raise the issue such that the trial court could rule on the matter.

*Sufficiency of Allowed Bias Cross–Examination*

■ Appellant argues that the court's limitations on his cross-examination of Grady—essentially preventing him from examining Grady regarding his previous

juvenile cases, probationary status, and recent arrest—impermissibly prevented his exploration of a potential source of bias. The government argues that, to the contrary, appellant was given sufficient opportunity to cross-examine Grady's potential bias under our case law.

■ It is well established that the complete denial of the opportunity to cross-examine a witness as to bias denies a defendant his Sixth Amendment right to confront witnesses against him. *See Van Arsdall, supra,* 475 U.S. at 680, 106 S.Ct. 1431; *Davis, supra,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. The Supreme Court has described this type of cross-examination as aimed at "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand" and has stated that such examination is "always relevant as discrediting the witness and affecting the weight of his testimony." *Davis,* 415 U.S. at 316, 94 S.Ct. 1105 (citing 3A J. WIGMORE, EVIDENCE § 940, at 775 (Chadbourn rev. 1970)). In *Van Arsdall* and *Davis,* the Supreme Court found reversible error where the trial court prevented all inquiry into the possibility that a key witness would be biased toward the government. 475 U.S. at 679–80, 106 S.Ct. 1431; 415 U.S. at 318, 94 S.Ct. 1105. In *Van Arsdall,* appellant was unable to question a key witness about a charge for public drunkenness that was dismissed, and arguably may have "furnished the witness a motive for favoring the prosecution...." 475 U.S. at 679, 106 S.Ct. 1431. In *Davis,* the key witness was on probation for burglary, and appellant was unable to cross-examine him and thereby pursue his argument that the witness was influenced by "undue pressure because of [his] vulnerable status as a probationer...." 415 U.S. at 318, 94 S.Ct. 1105.

■ It is also well-established that bias cross-examination is not limitless. "The Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431 (citing *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)) (emphasis in original). We have held that the court has discretion to impose reasonable limits on cross-examination that is repetitive, protracted, or cumulative. *Sherer v. United States,* 470 A.2d 732, 737 (D.C.1983) (citing *Brown v. United States,* 409 A.2d 1093, 1099 (D.C.1979)). In *Sherer,* we held that a witness's continuing relationship with the government was a proper subject of cross-examination, but that appellant was not denied his constitutional right and the trial court did not abuse its discretion where the court allowed inquiry into the witness's plea bargain in the current case but prevented inquiry into the witness's prior dealings with the government and alleged perjury in an earlier case. *Id.*

In the present case, appellant was afforded the opportunity to cross-examine Grady on his potential bias related to currying favor with the government. Defense counsel questioned Grady about his immunity agreement, selling drugs on the night of the shooting, the absence of a charge against him for selling drugs, and his initial refusal to cooperate with the government. Defense counsel used the information elicited on cross-examination to argue that Grady had a motive to curry favor with the government, and the court provided a jury instruction regarding the significance of the immunity agreement. *See* note 4, *supra.* Consequently, the limitations on cross-examination of Grady were not as extensive as those in *Van Arsdall* or *Davis,* where they completely prevented appellants from exploring the witnesses'

motive to curry favor with the government. Nor were the limitations as extensive as those in *Jenkins v. United States*, 617 A.2d 529 (D.C.1992), where we observed predicate "error" for the harmlessness holding of prohibiting cross-examination regarding the underlying crime to which a witness pleaded guilty because the jury was "without knowledge if the crime committed carried a significant sentence which might induce [him] to shade his trial testimony to curry the government's favor in the future." *See id.* at 532. In *Jenkins*, appellant was prohibited from demonstrating the core reason for the bias; here, appellant was not denied the opportunity to provide meaningful evidence of Grady's ongoing relationship with the government.

The limitations imposed on bias cross-examination in this case render it similar to *Sherer*, where we held that limitations imposed on inquiry into a witness's past relationship with the government did not deny appellant's right of confrontation because the witness's plea bargain in the present case allowed sufficient exploration of bias. As in *Sherer*, appellant was given an opportunity for effective bias cross-examination through inquiry into Grady's interactions with the government pertaining directly to the present case. Cross-examination regarding Grady's previous interactions with the government could reasonably be considered cumulative in addition to this evidence.

Appellant argues that the court had no discretion to "disallow the bias theory

proffered," that of Grady's "on-going relationship" with the government. But Grady's on-going relationship with the government is only one aspect of the overarching theory of bias that appellant proffered: his motive to curry favor with the government arising from his involvement with the law. The right to confrontation does not guarantee him the ability to cross-examine each separate incident that could give rise to bias. Just as we allow trial courts some discretion to curtail the use of previous convictions to impeach witnesses, the purpose of limiting cumulative bias cross-examination is to prevent the jury from being overwhelmed "where the prejudicial effect of the proffered evidence outweighs its probative value." *See Guzman v. United States*, 769 A.2d 785, 790 (D.C.2001) (citing *Brown v. United States*, 683 A.2d 118, 124 (D.C.1996)). Thus the trial court possessed discretion and did not abuse that discretion by limiting cross-examination of Grady to only some of the aspects that suggest bias toward the government.

■ Moreover, if we assume error, even constitutional error, as appellant claims, we must follow the ultimate holding in *Jenkins*, that the issue here raised would none-the-less be harmless beyond a reasonable doubt given the extensive corroboration of Grady's testimony described in the government's brief at pages 36–38 and *supra*, pages 348-49. *See* 617 A.2d at 533 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).[5]

5. We said, *supra*, that the issue of bias cross-examination pertaining to the alleged involvement of the Assistant United States Attorney in one of Grady's juvenile cases was not properly preserved for appeal. We cannot say that the lack of bias cross-examination on this subject constitutes plain error. *See Ferrell v. United States*, 990 A.2d 1015, 1022 (D.C.2010) (citing *Arthur v. United States*, 986 A.2d 398, 404 (D.C.2009)) ("[t]o demonstrate plain error, appellant must show that: (1) there is error, (2) the error is plain, meaning clear or obvious, and (3) the error affected substantial rights.... Even when the error meets these requirements, an appellate court need not notice it unless appellant also demonstrates that [(4)] the error resulted in either a miscarriage of justice, that is, actual innocence; or that the trial court's error ... seriously affect[ed] the fairness, integrity or public repu-

*Jury Instructions*

■ Appellant also argues that the court committed reversible error by providing a "coercive" "attitude and conduct of the jurors" pre-deliberation charge:

> The attitude and the conduct of jurors at the outset of their deliberation are matters of considerable importance. It is not appropriate for a juror entering the jury room to voice in advance a strong expression of an opinion on the case or to announce in advance a determination to stand for a certain verdict. When someone does something like that at the outset, their sense of pride, their ego, if you will, will cause them to hesitate to back away from that preannounced position even if another juror convinces them they should reconsider, even if another juror convinces them that they're wrong. Remember, you're not partisans or advocates in this case. You're not on the side of the defendant, you're not on the side of the Government. You are judges.
>
> The final test of the quality of your service will lie in the verdict that you *return to this courtroom, not in the opinions any of you may hold before agreement on a verdict*. Bear in mind, that you will make definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case.

In *Jones v. United States,* 946 A.2d 970 (D.C.2008), we held that it was error to give an instruction similar to this one because it encouraged the jurors to prioritize reaching a unanimous verdict at the expense of their own views of the case. *Id.* at 974. In the *Jones* instruction we found "serious defects of commission and omis-sion" that "convey[ed] an evident bias" toward reaching a verdict over the jurors' individual opinions. *Id.* In *Lampkins v. United States,* we considered a pre-deliberation charge similar to that in *Jones,* but noted some crucial differences that changed the tone of the instruction. 973 A.2d 171, 173 (D.C.2009). The instruction in *Lampkins* lacked the language from *Jones* that (1) the jurors should "[b]ear in mind that you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case," and (2) their "purpose should not be to support your own opinion, but rather to ascertain and to declare the truth." *Id.* (citing *Jones,* 946 A.2d at 973). As a result, we concluded that the instruction did not direct the jurors to disregard their own opinions in favor of judicial efficiency and reaching a verdict. *Id.*

Unlike the instruction in *Lampkins,* the instruction in the present case did contain the first statement ("[b]ear in mind that you will make a definite contribution to efficient administration if you arrive at a just and proper verdict in this case") that we deemed objectionable in *Jones.* We found this language objectionable because it suggests that obtaining a verdict is more important than the jurors' individual opinions. *See id.* However, this jury instruction as a whole differs from the *Jones* instruction significantly and does not, on the whole, encourage the jurors to ignore their individual opinions. The instruction in the present case did not contain the second statement to which *Lampkins* calls attention and which instructs the jury that their purpose is not to "support your own opinion but rather to ascertain and declare the truth"—language which we think re-

tation of judicial proceedings."). The court never precluded appellant from cross-examining on this subject, and consequently there was no error. Even if there had been error, it would not have been "clear or obvious" given the trial court's proper role in limiting cross-examination. *See Sherer, supra.*

veals to the jurors that reaching a verdict is more important than expressing their own opinions. Importantly, the present instruction adds language that we think changes the meaning of the instruction from that in *Jones*. The present instruction, unlike the Jones instruction, explains that the purpose of not preannouncing a position is that it may make them unwilling to change their position "even if another juror convinces them they should reconsider, even if another juror convinces them that they're wrong" and that this is important because "[they] are judges[,]" and "[they're] not on the side of the defendant, [they're] not on the side of the Government." In short this instruction cautioned against escalation of commitment to the original opinion as deliberations got underway.

Additionally, although we said in *Jones* that language cautioning the jurors not to "announce a determination to stand for a certain verdict[,]" was not objectionable because it is consistent with the generally recognized duty of jurors "to consult with one another" and to "consider[ ] . . . the evidence [impartially] with . . . fellow jurors" toward the goal of "reaching an agreement[,]" 946 A.2d at 973 (citations omitted), the careful modification of this language in the present instruction contributes to the difference in tone between the two instructions. The present instruction adds the words "in advance" to the language from the *Jones* instruction when it cautions the jurors not to "voice *in advance* a strong expression" or "to an-

nounce *in advance* a determination to stand for a certain verdict." This language discourages the jurors from being inflexible on the opinions they bring into the jury room; it does not discourage them from having opinions at all. The implication of the instruction in *Jones* was that the jurors should change their opinions to reach consensus; here it was that they should be willing to change their opinions if they are convinced that they are wrong.

How these fine nuances are really apparent to jurors is an open question, but in light of our earlier decisions which parse the words we are also obliged to do so. The trial judge is to be commended for his thoughtful crafting of the instruction which really counsels against rigidity and in favor of an open mind that hears other views before voting. Consequently we do not find error in the pre-deliberation charge.

*Merger*

Finally, appellant argues that the convictions for AAWA and AWIKWA, AAWA and ADW, and three counts of PFCV are violative of double jeopardy. The government concedes that the ADW and AAWA convictions merge, and the three PFCV convictions merge into one. We agree. *See Beaner v. United States*, 845 A.2d 525, 540 (D.C.2004) (ADW is a lesser included offense of AAWA); *Nixon v. United States*, 730 A.2d 145, 153 (D.C.1999) (possessory weapons offenses pertaining to a single violent act do not give rise to multiple convictions).[6]

**6.** Appellant also asks that we overrule our holding in *Nixon, but see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971) (one division of the court cannot overrule the decision of a prior division), in which we stated that AAWA and AWIKWA charges do not merge. 730 A.2d at 152. He urges that *Ingram v. United States*, 122 U.S.App.D.C. 334, 353 F.2d 872 (1965), an earlier decided case, was improperly over-

turned by *Nixon*. However, subsequent to *Ingram*, Congress codified the *Blockburger* test as the controlling test for determining whether offenses merge. *See* D.C.Code § 23–112 (2001); *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Applying the *Blockburger* test, we held in *Nixon* and in *Tolbert v. United States*, 905 A.2d 186 (D.C.2006) that these charges do not

For the foregoing reasons, the judgment of the trial court is affirmed on the merits. The case is remanded to the trial court to vacate the sentences as to the merged offenses.

*So ordered.*

merge. *Nixon,* 730 A.2d at 152; *Tolbert,* 905 A.2d at 190.