Edward L. **MARTINEZ**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 06–CF–996.

District of Columbia Court of Appeals.

Argued Dec. 3, 2008.

Decided Oct. 29, 2009.

---

Lee R. Goebes, appointed by this court, with whom James W. Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman, and Gary M. Wheeler, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, GLICKMAN and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

On June 7, 2005, after a trial before the Honorable Erik P. Christian, a jury found appellant Edward Martinez guilty as charged of first-degree premeditated murder while armed (D.C.Code §§ 22–2101, –4502 (2001)) and possession of a firearm during a crime of violence (D.C.Code §§ 22–3204(b) (2001)). Appellant seeks reversal of his convictions, citing (1) restrictions that the trial judge imposed on defense counsel's cross-examination and impeachment of a government witness, and (2) the erroneous aiding-and-abetting instruction that the trial judge gave to the jury. We affirm the judgments of conviction.

## I.

The case arose out of the killing of David Hicks in the alley behind his home in the 800 block of Kennedy Street, N.W. At trial, the government presented several witnesses. Daniel Powell testified that, on April 16, 2003, he spent part of the afternoon in the company of appellant Martinez (whom he called "Nitty"), Hicks, and another man. With appellant driving, the men rode around in a "greenish-bluish," four-door rental car, eventually stopping at a liquor store. After purchasing alcohol, they drove to the alley behind Hicks's home. Powell left the group for five minutes to use the bathroom at his sister's house. He returned to find appellant and Hicks arguing. As the altercation escalated, appellant threw a cup of liquor into Hicks's eyes. Crying and complaining that his eyes were burning, Hicks picked up a brick and "told [appellant] to get his damn car out of his yard." Appellant drove away, saying "That's how you feel? I'll be back." Fifteen or twenty minutes later, appellant returned to the alley in the same car, with another man in the passenger seat. Wearing a ski mask, the passenger exited the car, ran up to Hicks, shot Hicks with a pump-action shotgun, and pumped the weapon as if to fire once more. Powell ran out of the alley but, about five minutes later, encountered appellant again. Appellant drove up alongside Powell and, placing a finger to his own lips, said "Shh," an utterance that Powell understood as an acknowledgment that appellant "did something" and "didn't want [Powell] to say nothing."

Other government witnesses corroborated portions of Powell's account and provided additional details. Donna Baxter, who was in the alley behind Hicks's home that day, testified that she "didn't know what the fight [had been] over" but saw that Hicks was "upset." Baxter also testified

that she saw a masked gunman get out of a car and point a shotgun at Hicks. After shooting Hicks, the gunman re-entered the car and the car sped away. Baxter saw only "the shadow of the driver."

James Bush, who lived across the alley from Hicks, heard people arguing across the alley and then saw a dark-colored car pull off from the vicinity of Hicks's yard. Bush could not see the occupants of the car. Five or ten minutes later, Bush heard a loud boom, looked out, and saw the same car pulling off, "going real fast." Bush went outside to see what was going on and found that Hicks had been shot.

Brenda Lampkin testified that on the night of the shooting, she and her friend "Pat" (Ms.Willie Moore) were standing on the corner of the alley behind Hicks's home. Lampkin saw a dark blue car enter the alley and almost hit the two women. Lampkin could see that "Nitty"(whom she identified in court as appellant Martinez) was driving the car and that there was a passenger "laying down" in the car. After the car "went on up the alley," Lampkin heard a noise that Moore said was a gunshot. The women went into the alley and saw Hicks on the ground. Earlier in the day, Lampkin had witnessed a fight between Hicks and appellant.

Moore offered similar testimony. She testified that she and Lampkin were near the alley when a dark "greenish blue" car turned into the alley and almost hit her and Lampkin. Moore saw two people in the car, and, although she did not know the name of the driver at the time, she recognized him as a man she had seen earlier in the day when she was with

Hicks. After the car drove past, Moore heard a gunshot come from the direction of Hicks's house. Moore made an in-court identification of appellant as the driver.[1]

Metropolitan Police Department ("MPD") Officer Andre Harrison, who assisted in executing the arrest warrant for appellant, testified that appellant "took flight" when the officer approached and sought to speak with him. MPD Sergeant Fred Johnson also testified for the government. Sergeant Johnson was not the lead detective in the case, but interviewed witnesses, conducted photo identification procedures with Powell and Baxter, and prepared the PD–163 arrest report.

The defense presented no witnesses. After one day of deliberations, the jury returned guilty verdicts on both counts of the indictment.

## II.

Appellant argues that the trial court erred by limiting his proposed cross-examination and presentation of evidence relating to the alleged bias of Sergeant Johnson. Anticipating before trial that Sergeant Johnson would testify for the government, defense counsel informed the court that she intended to cross-examine Johnson about information the defense had received that "Johnson at this time has been relieved of his powers as a police officer and is under investigation for a number of matters." Defense counsel requested that the government be compelled to provide information as to "what those matters are that he's being investigated

---

1. An additional government witness was Hazel Flatts, who testified that appellant lived in her apartment at 809 Kennedy Street for a period of time. During the examination of Flatts, the prosecutor read her grand jury testimony in which she stated that during a telephone call around the night of Hicks's

murder, appellant said "if anybody come near to me, you don't know me." Flatts made a similar statement to a police detective on a recorded telephone call: she stated that on the night when Hicks was killed, appellant called her and said, "if anybody calls there looking for me, you don't know me."

for and where they are at this stage in the investigation." The prosecutor responded by telling the court that the nature of the investigation "is totally administrative and not criminal," and that there was "no investigation inside the U.S. Attorney's Office concerning" Johnson. The court then denied the defense request to compel disclosure, explaining that "it's my understanding that the Metropolitan Police Department is undertaking an administrative investigation, which is still pending, of [Sergeant] Johnson. There has been no action taken by the U.S. Attorney's Office with respect to … Johnson."[2]

Later in the pre-trial proceeding, the court took up the question of what inquiry defense counsel would be permitted to make with respect to the MPD internal investigation of Sergeant Johnson. The following exchange ensued:

> THE COURT: With respect to Sergeant Fred Johnson's matter pending in front of the Metropolitan Police Department, the Court is going to permit [defense counsel] to ask whether or not he knows if any administrative investigation is underway, just to that extent. Okay? We're not going to get into the details of that, just whether an administrative investigation is ongoing, whether he knows whether one exists.
>
> Defense counsel: Very well, Your Honor.
>
> THE COURT: And you're satisfied with that answer, whatever you get. And if he says yes, then you can ask him whether that shows whatever type of language you want to use for bias. But we're not going to get into a subject

matter. We're not touching the subject matter of that investigation.

> …
>
> Defense counsel: When I ask Sergeant Johnson about his knowledge of whether or not he is being investigated [by] MPD, I do believe that the questions to make the bias relevant will follow from what the procedure involves, and I just want to make sure that—
>
> THE COURT: No, we're not going to go into any procedure. The only question you'll be able to ask is whether he knows that he is being investigat[ed] by internal affairs or whatever branch he's being investigated by an administrative procedure. And if he says no, then you stop there. If he says yes, then does that affect your ability [to] provide testimony in whatever way. We're not going to get into the step-by-step procedures and the content of that administrative hearing …
>
> Defense counsel: And that's why I'm actually asking the Court to ask the government to provide the information. And this is why. I think that the case law allows us to not only present the area of bias but to show the link and to show the motives that curry favor.
>
> THE COURT: Okay. And I think you'll be able to show it with those particular questions, and I'm limiting your examination to that extent.

Appellant contends that the pending MPD internal administrative investigation provided Sergeant Johnson with a powerful motive to give, and to procure from potential witnesses, testimony, regardless of its truth, that would help close the

---

**2.** Our opinion in *Wheeler v. United States,* 977 A.2d 973, 991 (D.C.2009), explains that, during the spring and summer of 2005, "the Internal Affairs Division "IAD" of the MPD had been investigating Sergeant Fred Johnson … because of his failure to call the police or file a report about [a] robbery in his home until after" the murder of an individual suspected of committing the robbery. *Id.* at 991. "Sgt. Johnson's service with the M.P.D. was terminated in May, 2006." *Id.* at 991.

murder case and thus curry favor with the MPD (and with the U.S. Attorney's Office, should a criminal case against Johnson arise out of the internal investigation). Establishing Johnson's bias, appellant argues, not only would have undermined Johnson's credibility but also could have called into question the testimony of key witness Powell. Appellant contends that the limitations that the court imposed on defense counsel's cross-examination of Johnson violated appellant's Sixth Amendment right to confrontation and entitles him to reversal of his convictions.

■ The right of an accused to present a complete defense, "whether rooted directly in the Due Process Clause or in the Compulsory Process or Confrontation clauses of the Sixth Amendment," includes the guarantee of "a full and fair" opportunity to show that the government's witnesses are biased. *McDonald v. United States*, 904 A.2d 377, 380, 381 (D.C.2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)) (internal punctuation omitted). Bias includes a witness's self-interested motive to lie. *See, e.g, Brown v. United States*, 683 A.2d 118, 124 n. 7 (D.C.1996); *Ford v. United States*, 549 A.2d 1124, 1125 n. 2 (D.C.1988). As the trial court recognized, Sergeant Johnson's status as the subject of an MPD investigation, even a purely administrative one, was admissible as evidence of his bias because, at least arguably, it gave him a motive to "slant his testimony in favor of the government" in hopes of protecting or redeeming his stature within the police department. *Beynum v. United States*, 480 A.2d 698, 707 (D.C.1984) (citation omitted). If the trial court had precluded appellant's trial counsel from "*all* inquiry" into Sergeant Johnson's motive to fabricate in "favor[ ][of] the prosecution," it clearly would have committed constitutional error (requiring reversal unless the error was harmless beyond a reasonable doubt). *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (emphasis in original); *Brown, supra*, 683 A.2d at 124 ("the refusal to allow *any* questioning about the facts indicative of bias ... is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause") (emphasis in original) (citation omitted). A trial court also errs if it permits bias cross-examination but limits the questioning to conclusory, ultimate questions. *See Petway v. United States*, 391 A.2d 798, 801, 802 (D.C.1978) (explaining that a trial court "may not require counsel to ask questions in conclusory form of a witness whom he is questioning in order to demonstrate bias" because "to frame the question in direct and ultimate fashion would almost certainly ... involve[ ] a negative answer from the witness" and because permitting counsel to ask only "the ultimate question, without allowing him the opportunity to ask any preliminary questions" precludes the defense "from developing by preliminary questions evidence from which the jury could infer bias on the witness' part").

■ There are a number of ways in which the court at least arguably erred in responding to defense counsel's request and in limiting defense counsel's cross-examination of Johnson,[3] but we focus on

---

3. One example is the court's statement that "The only question you'll be able to ask is whether he knows that he is being investigat[ed] by internal affairs or whatever branch" and (if the answer to the first question is "yes") "does that affect your ability to provide testimony in whatever way." That statement can be read (and could have been heard) to mean that counsel could pose no more than precisely two questions on the subject of bias. On the other hand, the phrase "in whatever way" can be read to mean that

three aspects of the court's ruling, as to which, we conclude, the court unquestionably erred. First, the court shut-off defense cross-examination about the specific subject matter and procedural details of the MPD internal investigation without otherwise making or permitting adequate inquiry about the investigation. The subject matter and procedural details of the MPD investigation would not necessarily have given Sergeant Johnson a reason to fabricate testimony inculpating appellant or to pressure other witnesses to do so, but the court's error was in failing to obtain additional background about the pending IAD investigation (from the prosecutor, or through voir dire questioning of the Sergeant) that would have given the court a more informed basis for ruling on defense counsel's request for broader bias cross-examination. *Cf. Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979) (explaining that a trial court's ruling on matters committed to its discretion must be based on an "informed choice").

■ Second, the court erred in ruling that appellant's counsel would not be able to present extrinsic evidence related to the investigation if Sergeant Johnson had denied knowledge of the investigation. A "defendant may introduce extrinsic evidence to establish bias or prejudice because [bias] is not a 'collateral issue.'" *In*

*re C.B.N.,* 499 A.2d 1215, 1218 (D.C.1985) (quotation omitted); *see also In re S.H.,* 570 A.2d 814, 818 n. 14 (D.C.1990) (citing *United States v. Robinson,* 530 F.2d 1076, 1079 (D.C.Cir.1976)) ("Bias is never classified as a collateral matter which lies beyond the scope of inquiry, nor as a matter on which an examiner is required to take a witness's answer. Bias may be proved . . . even after a witness's disavowal of partiality") (quoting 3 WEINSTEIN'S EVIDENCE § 607[03] at 607–17 (1975)).[4]

■ Third, the court erred insofar as its ruling was intended to foreclose defense counsel's inquiry into the sanctions that Sergeant Johnson could face at the conclusion of the internal investigation. As our case law firmly establishes, inquiry into whether a government witness might be facing severe penalties that his testimony might help avert can be an important part of effective cross-examination for bias. In *Jenkins v. United States,* 617 A.2d 529, 532 (D.C.1992), the trial court permitted the defendant to elicit that a government witness had pled guilty to criminal charges and had not yet been sentenced, but the court prohibited questioning about the "exact nature of the [witness's] crime," such that the jury was "without knowledge if the crime committed carried a significant sentence." We concluded that the limitation on cross-examination violated the de-

counsel could probe "in whatever way" (including with a string of questions) whether the pending internal affairs investigation motivated Sergeant Johnson to color his testimony or to testify untruthfully. *Cf. Howard v. United States,* 978 A.2d 1202, 1209 (D.C.2009) ("[T]he court should have allowed counsel to cross-examine the government witnesses . . . to explore what they knew about [appellant's lawsuit against two fellow police officers] and whether they were, during the search [of appellant's home], influenced in any way by that knowledge").

4. Requiring defense counsel to "stop there" if Sergeant Johnson disclaimed knowledge

about the internal MPD investigation might well have left the jury to think "that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Davis, supra,* 415 U.S. at 318, 94 S.Ct. 1105.

Nevertheless, the court's ruling that precluded the introduction of extrinsic evidence about the internal investigation was almost certainly harmless. In his brief on appeal, appellant expresses certainty that, if asked, Johnson would likely have confirmed that he was under investigation.

fendant's Sixth Amendment confrontation rights and, applying the standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we held that reversal would be required unless the error was "harmless beyond a reasonable doubt." *Jenkins*, 617 A.2d at 532–33. Subsequently, in *Sothern v. United States*, 756 A.2d 934, 938–39 (D.C.2000), we concluded that the trial court could properly prevent defense counsel from "mention[ing] the actual charge" pending against a prosecution witness, but observed that there would have been a "*Jenkins* issue" if the trial judge had refused to "g[i]ve counsel permission to elicit the penalty." These decisions compel us to conclude that, at the very least, appellant was entitled to cross-examine Sergeant Johnson about the potential penalty Johnson would face *if the outcome of the pending MPD internal investigation was adverse to him.*

Although the court prohibited cross-examination about the "details," "subject matter," and "procedures" of the internal investigation, the court did not state expressly that defense counsel was precluded from eliciting testimony about the sanctions that Sergeant Johnson might face or about the suspension of his police duties while the investigation was ongoing. But, especially in light of the government's concession at oral argument that this was the most reasonable interpretation of the judge's statement,[5] we assume this was the scope of the restriction that the court imposed. The restriction was legally erroneous since (if counsel had asked Johnson about the pending internal investigation) it may have "precluded the jury from 'appropriately drawing inferences relating to the reliability of the witness.'" *Jenkins*, *supra*, 617 A.2d at 533 (quoting *Van Arsdall, supra*, 475 U.S. at 680, 106 S.Ct. 1431); *see also id.* at 532 (reasoning that only if the jury knew whether the government's witness faced the possibility of a significant sanction could the jury effectively assess the extent to which the witness might have been subject to inducement to "shade his trial testimony to curry the government's favor in the future").[6]

Because the trial court's errors included entirely precluding a relevant line of bias cross-examination—inquiry into the sanctions that Sergeant Johnson possibly faced—our inquiry must be "whether, assuming that the damaging potential of the cross-examination were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall, supra*, 475 U.S. at 684, 106 S.ct. 1431; *see also Jenkins, supra*, 617 A.2d at 532–33. Whether the trial court's error was harmless "depends upon a host of factors, . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cu-

---

**5.** At oral argument, a member of the panel asked, "Under the court's restrictions, could defense counsel have elicited that the officer, at the time of trial, had been suspended from his duties?" Counsel for the government responded, "I don't think so."

**6.** Appellant's counsel ultimately did not ask the witness about the investigation, not even posing the questions that the court had explicitly permitted. This does not preclude our full consideration of the arguments that appellant has presented here. *Cf. Obiazor v. United States*, 964 A.2d 147 (D.C.2009). In

*Obiazor,* the trial court prevented defense counsel from questioning a witness about the witness's prior false allegations of sexual abuse but allowed counsel to ask "whether [the witness] fabricated the story against appellant to get attention from her mother." *Id.* at 152. Counsel chose not to ask the question suggested by the trial court. We declined to hold this fact against the appellant, because the permitted question "would not have had the same effect" as the disallowed question. *Id.*

mulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431; *see also Jenkins, supra,* 617 A.2d at 533. With these factors in mind, we look at the content of Sergeant Johnson's testimony.

Sergeant Johnson's testimony on direct examination covers just five transcript pages.[7] Johnson testified about the photo array (Government Exhibit 37) that he prepared and the photo identification procedure he conducted with Powell on July 27, 2004. Specifically, Johnson testified that, upon being shown the photo array, Powell said, "That's Nitty." Johnson also testified that when Powell was asked two supplemental questions ("Where was Nitty at the time of shooting?" and "Where did the shooter go after shooting [Hicks]?"), Powell answered that "Nitty" was "in the car" at the time of the shooting and that, after the shooting, "Nitty came to me and said, 'be quiet.'" Johnson testified that Powell put his initials on Exhibit 37 behind each of his recorded statements.

Thus, the significance of Johnson's testimony for the government's case was that, when Johnson interviewed Powell on July 27, 2004, Powell made two statements that inculpated appellant: that appellant was "in the car" and that, after the shooting, appellant signaled to Powell to "be quiet." Powell made these same inculpatory statements during his own trial testimony. If credited, Johnson's testimony could have bolstered Powell's trial testimony by showing that it was not newly fabricated.

Johnson's direct testimony was not the only testimony that bolstered or corroborated Powell's trial testimony, however. During the government's re-direct examination of Powell, the jury heard that when Powell appeared before the grand jury on July 27, 2004, he (1) told the grand jury that he had picked out appellant from the photo array and (2) described for the grand jury the incident during which appellant put his finger to his mouth to signal Powell to "be quiet." In addition, government witnesses Lampkin and Moore both identified appellant as the driver of the car that entered the alley just before they heard a shot fired. Also, Baxter and Bush corroborated Powell's testimony about an altercation involving Hicks and about a gunshot fired after a car entered the alley. Thus, Johnson's testimony that recounted the inculpatory statements that Powell made about appellant was neither "central" nor "crucial to the prosecution's case." *Olden v. Kentucky,* 488 U.S. 227, 233, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (internal punctuation omitted). Rather, Johnson's testimony was entirely "cumulative"; there was other "evidence corroborating ... [Johnson's] testimony ... on material points." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. *Cf. United States v. Beck,* 557 F.3d 619, 621 (8th Cir.2009) (any error in precluding cross-examination about officer's involvement in scandal, which had been investigated by Internal Affairs and had led to officer's suspension, was harmless, because "even if [the officer's] testimony were thoroughly discredited by the ... scandal," the testimony was duplicative and had been corroborated by the testimony of other witnesses).[8]

---

7. The bulk of Johnson's testimony was on cross-examination, which covers thirteen transcript pages.

8. As discussed *infra,* appellant argues that if his trial counsel had been able to uncover Johnson's biases to the full extent guaranteed by the Constitution, the corroboration of Pow-

Our analysis does not end, however, with our inquiry into whether Johnson's testimony—unimpeached by the proposed bias cross-examination—was cumulative of other testimony that corroborated Powell's trial testimony. Because we must "assum[e] that the damaging potential of the [precluded] cross-examination [was] fully realized," *Van Arsdall, supra,* 475 U.S. at 684, 106 S.Ct. 1431, the remainder of our analysis begins with the assumption, which appellant urges, that defense counsel's proposed cross-examination of Johnson (about his possible motive to procure false statements from Powell) would also have given jurors "a significantly different impression of [Powell's] credibility." *Id.* at 680, 106 S.Ct. 1431. The government urges that this consideration is not properly before us because, during the proceedings in the trial court, defense counsel never specifically argued or provided any evidence that Johnson may have improperly influenced Powell. This argument has some force because, as the government points out, defense counsel's theory, insinuated (though never clearly asserted) at various points in the trial, was that a *different* police officer (Detective Don Juan Monroe, whom neither party called to testify) had manipulated witnesses to obtain their favorable testimony. Still, some of defense counsel's questions suggest that counsel may have contemplated a similar tack with respect to Johnson. For example, defense counsel probed Johnson about whether he, rather than Powell, had written on the back of the photo array the statements that Powell initialed. In addition, as mentioned in note 9 *supra,* defense counsel inquired whether, prior to taking the witness stand, Lampkin had waited in the witness room with "all the detectives that have been involved in this case," a group that presumably included Johnson and Harrison (but may not have included Monroe, who did not testify). In light of our obligation to assume the full "damaging potential" of the precluded cross-examination, *id.* at 684, 106 S.Ct. 1431, we think it appropriate to assume for purposes of our analysis that the defense would have used any evidence of bias that it elicited from Johnson in the same way it attempted to use evidence of Detective Monroe's role.

ell's trial testimony by Powell's July 2004 grand jury testimony would have been undermined, because "the jury reasonably could have concluded that [Johnson] had pressured and tampered with Powell [with whom Johnson met just before Powell's July 2004 grand jury appearance] and thereby convinced the vulnerable witness [Powell] to identify Martinez as the driver and to add other details to his story to assure Martinez's conviction." This argument does not apply, however, to the other corroborating testimony. For example, no evidence was presented that Johnson had the opportunity to influence Lampkin's or Moore's identifications of appellant as the driver of the car they saw in the alley around the time of the shooting. (From Lampkin, the defense did elicit testimony that, prior to testifying at trial, she had been in the witness room "with all the detectives that have been involved in this case," but also elicited that she had earlier provided her identification testimony when she appeared before the grand jury, which Lampkin testified (on re-direct), was on May 9, 2003.) Thus, even if the proposed bias cross-examination had weakened both Johnson's and Powell's testimonies, it would have left Lampkin's and Moore's testimonies undisturbed. *Cf. United States v. Figueroa,* 548 F.3d 222, 228 (2d Cir.2008) (error in restricting bias cross-examination was harmless where the proposed cross would not have affected the credibility of another witness who gave corroborating testimony).

We recognize that Lampkin's and Moore's testimonies were impeached to an extent by evidence of their drug use on the day of the shooting (and perhaps on the days when they testified), but our point here is that nothing in the record suggests that the credibility of these witnesses was affected by the restrictions the court imposed on cross-examination of Johnson.

Accordingly, to assess the impact of restricting the bias cross-examination, we must further ask whether there was other evidence that undermined or "contradict[ed] the testimony [of Powell] on material points." *Van Arsdall, supra*, 475 U.S. at 684, 106 S.Ct. 1431. There was. Most significant, on cross-examination, Powell acknowledged that when he first appeared before the grand jury on May 14, 2003, he told the grand jury that he "couldn't say it was [appellant] driving the car" because "[a]t the moment, at the time," he didn't know. In cross-examining Powell, the defense further elicited that, during Powell's May 2003 appearance before the grand jury, he testified that he ran home after the shooting and mentioned nothing about anyone telling him to be quiet. Powell also testified on cross-examination that he did not actually see Hicks get shot, and he acknowledged that, when he initially spoke with police, he did not identify the person involved in the shooting.[9] Powell did not identify appellant until 2004, when he was questioned by Sergeant Johnson and then appeared before the grand jury the second time.

Thus, the defense effectively impeached Powell's direct testimony on several crucial points, including the very points—Powell's identification of the driver and the driver's telling Powell, "shh"—that Johnson recounted during his direct testimony and that (appellant theorizes) Johnson must have induced Powell to make. *Cf. United States v. Feliciano*, 300 F.App'x 795, 800 (11th Cir.2008) (trial court's error in barring certain impeachment cross-examination of government witness was harmless where the defense was able to obtain the desired impeachment by questioning another witness). And, it appears that these discrepancies between Powell's May 2003 grand jury testimony on the one hand, and his July 2004 grand jury testimony and direct trial testimony on the other hand, did not go unnoticed by the jury. Shortly after it began its deliberations, the jury sent a note to the judge asking to review the transcripts from the dates of Powell's two appearances before the grand jury. The judge replied that the transcripts would not be made available, as they had not been admitted into evidence. Because Powell was "thoroughly impeached"[10] (and, it seems to us, was made to look foolish upon the cross-examination that was permitted), we conclude that the precluded cross-examination of Johnson— even accorded its full damaging poten-

---

9. Moreover, during its cross-examination of Sergeant Johnson, the defense was able to elicit other testimony that significantly impeached Powell's direct testimony. For example, Powell testified at trial that after the altercation with Hicks, appellant said "I'll be back" before driving out of the alley. But Johnson testified on cross that when he interviewed Powell about the April 16, 2003 fight, Powell never told him that anyone had said, "I'll be back." Rather, Johnson acknowledged, Powell told him that the person in question had "said absolutely nothing." In addition, Powell testified on direct that the car involved in the incident was "greenish-bluish" and had four doors. Johnson, by contrast, testified that Powell told him that the vehicle was green, and, although Johnson pressed Powell for details about the car, Pow-

ell said nothing to Johnson about the number of doors that the car had. At trial, Powell testified that the shooter "ran up" to Hicks, but, when Johnson interviewed Powell before Powell went before the grand jury in July 2004, Powell said that the shooter "walked up." While Johnson testified that he interviewed Powell "at least twice," Powell testified that he "never met" Johnson.

On cross-examination, Johnson also gave other testimony that was helpful to the defense case. For example, he testified that Baxter did not identify appellant's photo in the photo array that he showed her.

10. *Perez v. United States*, 968 A.2d 39, 90 (D.C.2009); *Fuller v. United States*, 873 A.2d 1108, 1115 (D.C.2005).

tial—would have been only cumulative insofar as it was intended to discredit Powell. In other words, the purpose of the precluded cross-examination of Johnson, following his very limited direct testimony about what Powell told him, was fully achieved through the defense's cross-examination of Powell, which made Powell look wholly unreliable, and undoubtedly rendered his testimony inculpating appellant entirely suspect (except insofar as his testimony was corroborated by that of other witnesses).

Appellant argues that, notwithstanding the impeachment of Powell, the restrictions that the trial court imposed robbed the defense of "a powerful and cohesive theory with respect to why [Powell's] versions of events improved" and why "the certainty with which [Powell] identified Martinez as the driver to the shooting, only appeared after a July 27, 2004 meeting with ... Johnson." The court's ruling may have impaired somewhat the defense's ability to advance its theory about how Sergeant Johnson's alleged bias translated into testimony by Powell inculpating appellant, but we not persuaded that the ruling eliminated that ability altogether. What primarily impaired the defense's ability to argue this theory to the jury was that appellant's trial counsel did not ask the cross-examination questions that the court "otherwise permitted," *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431—questions that appellant concedes would likely have resulted in Sergeant Johnson's acknowl-

edgment that he was indeed under investigation by the MPD.[11] Nothing would have precluded the defense, armed with that response, from arguing to the jury that Johnson had more than the usual motive to close the case and to goad Powell to alter his testimony to help accomplish that result; and that the changes in Powell's testimony from his first grand jury appearance to his second were best explained by the fact that, during the interim, he was interviewed by Johnson and fell under Johnson's biased influence.[12] *Cf. Beynum, supra,* 480 A.2d at 707 (upholding conviction where "jury was aware of sufficient facts, and heard sufficient testimony, from which it could infer (and from which defense counsel could argue) bias"). Moreover, eliciting testimony from Sergeant Johnson about his jeopardy from the IAD investigation would not have enhanced the defense theory very much, because the defense still had no evidence of any actual manipulation or pressure by Johnson on Powell—just speculation.[13]

■ For this court to conclude that a restriction on bias cross-examination amounted to harmless error, it must be clear beyond a reasonable doubt that (1) "appellant would have been convicted without the witness's testimony, or (2) the restricted line of questioning would not have weakened the impact of the witness's testimony." *Jones v. United States,* 853 A.2d 146, 154 (D.C.2004) (citation omitted). Focusing on the second of these tests, we

---

11. As we reasoned in *Wheeler,* defense questioning that revealed merely that Sergeant Johnson knew that he was being investigated would have "cast[ ] a shadow over Sergeant Johnson's credibility and possible bias in favor of the government." 977 A.2d at 992.

12. Defense counsel did argue, less pointedly, that Powell did not "make his ID [of appellant until] 2004[,] almost a year or more after this happened ... after [he] talked to the police."

13. In addition to the defense theory about Johnson pressuring Powell in 2004 having been only speculation, there may have been little force to a defense argument that Johnson's actions in 2004 were motivated by an IAD investigation that (as described in *Wheeler,* see note 2 *supra* ) apparently did not commence until 2005.

conclude, for the reasons discussed above, that Johnson's unimpeached direct testimony had a very weak (if any) impact on the outcome of this case and that the proposed bias cross-examination would not have appreciably weakened whatever impact the testimony had. In addition, as we have explained, the defense effectively exposed the stark inconsistencies and weaknesses in the identification testimony of Powell, the government witness whom, appellant argues, Johnson may have improperly influenced. For these reasons, we are satisfied beyond a reasonable doubt that the trial court's error in restricting the defense's bias cross-examination was harmless. *Cf. Jones,* 853 A.2d at 154 (trial court's error in curtailing bias cross-examination of police detective was harmless because the detective was merely a supporting witness and his testimony was cumulative; because, with regard to the central government witnesses, the "circumstances surrounding their behavior and testimony regarding ... identification were fully explored before the jury" and "[t]he lack of ... identifications in some instances was made clear").

## III.

■ As his second basis for appeal, appellant argues that an error in the aiding-and-abetting instruction that the trial judge gave the jury requires us to reverse his conviction. The trial court gave the "natural and probable consequences" instruction [14] that, subsequent to appellant's trial, we held may not be used to convict a defendant of the specific intent crime of first-degree murder. *See Wilson–Bey v. United States,* 903 A.2d 818, 830 (D.C. 2006) (en banc) ("conviction of first-degree pre-meditated murder on an aiding and abetting theory requires the prosecution to prove that the accomplice acted with pre-meditation and deliberation and intent to kill").

■ As appellant acknowledges, the defense did not object to the aiding-and-abetting instruction, so our review here is for plain error. *See Kidd v. United States,* 940 A.2d 118, 126 (D.C.2007). To warrant reversal under a plain error rule, "there must be: (1) error (2) that is 'plain' (3) that affects substantial rights and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

■ The parties agree that we must resolve the first two inquiries in favor of appellant, because the jury instruction was erroneous and that error is now plain.[15] Accordingly, we focus our analysis on the third prong of the plain-error test. To show that the erroneous instruction affected his substantial rights, appellant must demonstrate "a reasonable probability [that] the error[ ] had a prejudicial effect on the outcome of his trial." *Thomas v. District of Columbia,* 942 A.2d 645, 650

---

**14.** The court gave this instruction:

It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or that he have ... intended to commit the particular crime committed by the principal offender. An aider and abetter is legally responsible for the acts of other persons that are the natural and probable causes of the crime in which he intentionally participates.

**15.** We have previously said that "where the law at the time of trial was ... clearly contrary to the law at the time of appeal ... it is enough that an error be 'plain' at the time of appellate consideration." *Drayton v. United States,* 877 A.2d 145, 148 (D.C.2005) (quoting *Johnson, supra,* 520 U.S. at 468, 117 S.Ct. 1544).

(D.C.2008). Appellant has not made the requisite showing. Notably, the defense did not argue that appellant lacked the intent for first-degree murder; rather, the defense argument was that appellant simply was not in the alley when the crime was committed. The jury must have believed, to the contrary, that appellant was present in the alley during the shooting. The only testimony the jury heard about appellant's role was that, having earlier fought with Hicks and departed the alley angrily, appellant drove back to the alley where Hicks was located, with a masked gunman in the passenger seat. There was no evidence that, after the gunman shot Hicks and prepared to fire again, the driver (identified by three witnesses as appellant) reacted with alarm or concern, as if this were a surprising or unwanted development. Instead, witnesses testified, the driver allowed the shooter back into the car and fled from the scene. From this evidence, the prosecutor argued that appellant "instigated the shooting of David Hicks."

These facts render this case remarkably similar to *Kidd*, in which the defendant's intent to kill was evident from, *inter alia*, "his anger and argument [with the victim]," his "continuing ... presence next to [the victim] while a third man approached rapidly and shot [the victim]," and "his flight immediately after the shooting." 940 A.2d at 128 (concluding that "[i]n short, the government presented strong and substantial evidence of premeditation, deliberation, and specific intent, uncontroverted by anything except [appellant's] self-serving statement ... that he was home in bed at the time of [the] murder"). As in *Kidd*, "we are convinced that [appellant] was convicted of first-degree premeditated murder while armed because reasonable jurors inferred from the facts and circumstances surrounding the murder that he had the requisite *mens rea*." 940

A.2d at 128 (citations and internal quotation marks omitted). We see no "reasonable probability" that the jury convicted appellant without finding that he shared the gunman's *mens rea* or that the jury would have acquitted appellant if the erroneous "natural and probable consequences" language had been omitted from the aiding-and-abetting instruction. *Thomas, supra*, 942 A.2d at 650.

For the foregoing reasons, the judgments of conviction are

*Affirmed.*