*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0048

LUIS RIVERA, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF3-003464)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued April 29, 2025                    Decided September 25, 2025)

*Thomas T. Heslep*, appointed by this court, for appellant.

*Dylan M. Aluise*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Lindsey N. Miller*, and *Valerie Tsesarenko*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, DEAHL, and HOWARD, *Associate Judges*.

DEAHL, *Associate Judge*: Luis Rivera was charged with two counts of felony assault on a police officer (APO) with significant bodily injury while armed, two lesser included counts of felony APO with significant bodily injury (unarmed), and two still lesser included counts of misdemeanor APO. Those charges stemmed from

a large protest in D.C.'s Lafayette Square that turned violent. The government alleged that Rivera threw two large, T-shaped, metal objects into a line of law enforcement officers who were pushing protesters out of the park, and that those objects hit and injured two police officers. The jury acquitted Rivera of the lead felony counts against him, but found him guilty of the two misdemeanor APO counts.

Rivera now appeals and raises two issues. First, during deliberations, the jury asked the court if the government was required to prove that Rivera "was attempting to injure a specific named officer." In response, the trial court answered that the government did not need to prove that Rivera was attempting to injure a particular officer. It explained that so long as Rivera intentionally threw the objects, and thereby "created a zone of harm" around the officers with the intent to "injure/harm" them, that satisfied the elements of APO. Rivera argues that response was erroneous and requires reversal. Second, Rivera attempted to cross-examine several officers about their purported biases. Although the trial court allowed some quite limited cross-examination on that topic, it curtailed much of what Rivera contended was within the scope of proper bias cross-examination, and Rivera now argues that was reversible error. Discerning no reversible error, we affirm.

## I. Factual and Procedural Background

On June 22, 2020—in the weeks following George Floyd's murder and amidst the various demonstrations that followed—police officers were called to Lafayette Square to remove protesters who were trying to tear down a statue.[1]  The officers convened in the park and created a police line around the statue in order to protect it.  The officers then sought to move the protesters out of the park.  To do that, they stood "side by side" and, with their backs to the statue, walked toward the protesters to push them toward H Street, which marks the park's northern boundary.

Detective Molly Pelta and Officer Brandon Motley testified about what happened next, with the aid of multiple vantage points captured by their body worn cameras, or BWCs.  At 8:19 p.m., as captured on Pelta's BWC, a person threw what appears to be a heavy, T-shaped, metal object at the line of police officers.  It is not entirely clear what the object was, but from the video evidence it looks like a metal footing for a police barricade, as Pelta surmised.  Pelta testified that she saw the man who threw the object and described him as wearing a "white-colored shirt, light-colored shorts, and a red bandana."  Seconds after the first throw, the BWC footage shows the same man picking up a similar object.  And about thirty seconds after the

---

[1] It was a statue of former President Andrew Jackson, but the parties agreed not to mention that before the jury in an effort to depoliticize the trial.

first throw, as captured on Motley's BWC, a man wearing the same red bandana throws a similar T-shaped metal object at the line of police officers. Pelta testified that the same man threw both objects.

Officers Phillip Burggraf and Anthony Boone were the officers hit by the metal projectiles and they both testified as well. Burggraf, who was standing behind the police front line, testified that a metal object flew over the heads of officers in front of him, "bounced" on the ground, and then hit him on his right shin, causing a laceration on his leg. Boone testified that shortly after that happened, a flying metal object struck his "right shoulder." Detective Sergeant Carl Holmberg with the U.S. Park Police was standing near Boone and also saw the second metal object fly in their direction. Neither Burggraf, Boone, nor Holmberg saw who threw the objects.

Detective Yaroslav Babich also testified for the government. Babich, who was not at the protest, reviewed "hundreds" of BWC videos after the protest to determine the thrower's identity, including Officer Brian Rodriguez's BWC footage, which Rodriguez authenticated in his testimony. Babich testified that, according to his review, the person who threw the objects wore a "gray top" with Cyrillic writing, "gray bottom[s]," and a "red bandana." With those identifying characteristics in mind, Babich found clear still frame photos of who he believed the assailant was and used them to put out a "be-on-the-lookout" notice, or a BOLO, for the individual,

complete with his photo. After receiving the notice, Pelta confirmed that Babich had correctly identified the person whom she saw throw the metal objects. Somebody recognized Rivera from the BOLO and identified him to authorities several months after the protest, and Rivera was ultimately arrested and charged.

Defense counsel sought to cross-examine several of the testifying officers about a variety of disciplinary matters, but the court sweepingly precluded him from doing so, mostly on relevance grounds. Counsel sought to cross-examine Motley about two instances in which he had previously failed to timely activate his BWC. The trial court precluded that line of cross-examination as irrelevant, because there was no suggestion that Motley failed to activate his BWC at the protest, and there did not appear to be any allegation that Motley had intentionally failed to turn on his BWC in those prior instances (he simply turned it on later than he should have). Defense counsel also sought the court's permission to question Burggraf about a pending use of force complaint and about a sustained "body-worn camera violation." The government opposed, explaining as to the use of force complaint that it had asked Burggraf if he was aware of any ongoing investigations against him, and he said that he wasn't, so that he could not have had any "motive to curry favor" with the government based on that unknown-to-him complaint. The trial court offered Rivera an opportunity to question Burggraf outside the jury's presence about that proffer, but reasoned that unless Rivera could establish some basis to think Burggraff

knew about the use of force complaint, questioning about that would likewise be precluded. Rivera declined the invitation to probe Burggraf's claimed ignorance of that disciplinary matter.

As to Boone, defense counsel sought to question him about a pending civil "police conduct" lawsuit against him. The plaintiff in the civil suit alleged that Boone and other officers falsely arrested and physically beat him. The court permitted counsel to question Boone about the suit in generic terms, as an ongoing lawsuit against him that gave him some reason to curry favor with the government, but the court precluded counsel from delving into the substance of the allegations. During Boone's cross-examination, defense counsel asked Boone about whether he used force at the protest. Boone denied personally using any force against the protesters, and counsel then asked if it was "true" that Boone was being sued "for police conduct." Boone admitted he knew about the lawsuit, but testified that he had "nothing to do with" what happened in that case. The government objected, and the trial court sustained the objection, reasoning that the way defense counsel "ask[ed] the question [about the lawsuit], right after the use of force questions, seem[ed] to indicate that [it was] a lawsuit regarding use of force." The trial court ruled that the questioning violated its limitations on cross-examination and, as a remedy, the court instructed the jury that the referenced "lawsuit is not related to the circumstances in this case," repeating that "[i]t's not related to the events of June 22nd, 2020." Rivera

also unsuccessfully sought to question Boone about a previous failure to activate his BWC.

Defense counsel also sought to cross-examine Babich—the detective who exhaustively reviewed the video footage—about a sustained complaint against him for conduct unbecoming of an officer that resulted in Babich's suspension. The complaint against Babich focused on text messages he apparently sent to a civilian in the aftermath of the January 6th attack on the United States Capitol. In his text messages, Babich complained about another officer who was at the scene of that insurgency and was talking about it to the press. Babich wrote that he "wonder[ed] if [that officer] realizes how many people have watched his BWC" and "how damaging it could be to have inconsistences in what you tell the media." In another text, he wrote "All I know is, don't talk to the media about investigations. Don't admit to the media you are a plainclothes officer, when you damn well know that's unauthorized and you're putting your supervisors out to dry." The trial court precluded counsel from cross-examining Babich about that, explaining that it was irrelevant to any issue before the court and did not speak to any potential "corruption bias" that Babich might have.

Defense counsel did cross-examine Babich about some perceived discrepancies in the BWC footage he reviewed, however. Namely, defense counsel

questioned Babich about an eleven-second timestamp differential in Rodriguez's video and the BWC footage taken by another officer, Arthur Hopper, who did not testify. That is, if you watched their BWC videos side-by-side, so that the action aligned, the videos' timestamps were off by eleven seconds. Babich essentially shrugged the discrepancy off as a byproduct of inexact timestamps, nothing more. Defense counsel cross-examined Officer Rodriguez—whose BWC footage accounted for the asynchrony—as well. Rodriguez answered that he did not know why the timestamps in the videos were not aligned.

Defense counsel then sought to cross-examine Rodriguez about his own disciplinary infraction for "egregious misconduct." Namely, on one occasion Rodriguez was driving his police cruiser and he sideswiped a vehicle on his way to an assignment without stopping—a hit-and-run. Rodriguez eventually returned to the scene later, but only after the owner of the damaged car called 911. The defense argued that the misconduct spoke to Rodriguez's "credibility and reliability" as a witness. The trial court disagreed and precluded defense counsel from examining Rodriguez about that disciplinary matter.

After the jury began its deliberations, it sent a note asking whether it was "necessary for the Government to prove that the defendant was attempting to injure a specific named officer." The defense argued that the note should be answered in

the affirmative—with a "yes," meaning the government had to prove that Rivera "intend[ed] to strike the victim[s]," Officers Burggraf and Boone, in particular. The trial court rejected that view and issued what is referred to as a "concurrent intent" instruction, *see* Criminal Jury Instructions for the District of Columbia, No. 3.201 (5th ed. 2024), modified to fit the particular facts of the case:

> I have already instructed you on the offense of Assault on a Law Enforcement Officer with Significant Bodily Injury or Grave Risk While Armed and the two lesser included offenses. I further instruct you that if the government proves beyond a reasonable doubt that Luis Rivera threw T-shaped objects and that by throwing T-shaped objects, created a zone of harm/danger around the line of law enforcement officers, with the intent to injure/harm them, you may infer that Luis Rivera intended to injure/harm any other person in the anticipated zone of harm/danger and Luis Rivera has committed the same type of assault against Phillip Burggraf and/or Anthony Boone as he would have committed had he also injured/harmed the line of law enforcement officers.
>
> This principle applies whether or not the intended victim is also injured/harmed and whether or not the intended victim is identified.

The jury found Rivera guilty of two counts of misdemeanor APO, and Rivera now appeals.

## II. Analysis

Rivera raises two challenges on appeal. He argues that the trial court gave a legally erroneous instruction in response to the jury's note inquiring whether the government had to prove that Rivera intended to hit the two particular officers who were ultimately struck. He also contends that the trial court erred when it limited his various lines of bias cross-examination. We review both of these issues in turn.

### A. Any erroneous response to the jury's note was harmless.

Rivera argues that the trial court erred when it responded to the jury's note regarding whether the government had to prove that Rivera intended to hit Officers Burggraf and Boone in particular. That is, the jurors asked whether it was "necessary for the Government to prove that the defendant was attempting to injure a specific named officer." Rivera argued at trial that the note should be answered in the affirmative, that the government had to prove that Rivera "intend[ed] to strike the victim[s]." The trial court rejected that view and answered the question in the negative, and responded with a concurrent intent instruction, which told jurors that Rivera could be convicted if he threw the T-shaped object with the intent to injure/harm some officer in the police lines, even if he had no particular target in mind.

Now on appeal, Rivera has abandoned his trial position that the note should have been answered in the affirmative. Instead, his current position concedes that the court properly answered the note in the negative, telling the jury that the government did not need to prove that Rivera hit a specifically intended target so long as the object was thrown at a group of police officers with the intent to injure or harm any member of the group. Despite conceding the general accuracy of the trial court's response, Rivera now offers a more discrete critique of it, claiming that it was potentially confusing because it suggested, at odds with the evidence, that Rivera did in fact have a particular target in mind. Rivera aims this critique principally at the response's concluding sentence: "This principle applies whether or not the intended victim is also injured/harmed and whether or not the intended victim is identified." That sentence, Rivera now posits, was confusing because it suggested Rivera in fact had an intended target, when that was "not supported by the evidence" so it invited the jury "to speculate."

We confess that we have a hard time understanding Rivera's complaint with the judge's response where, based on the premises of his argument, it seems more favorable to him than what he now advocates for. Suffice it to say, even if we agreed with Rivera that the trial court needlessly suggested that he had or needed to have an intended target when the evidence and the law did not support those views, that confusion was largely immaterial where Rivera now concedes that the thrust of the

trial court's answer was correct. That is, he concedes that the jury could have properly convicted him of the misdemeanor APO counts so long as the evidence showed that he intentionally threw the metal objects into a group of police officers with the intention of injuring or harming any one of them. That issue was at the core of the jury's expressed confusion, and it is now undisputed that the trial court accurately cleared that confusion up in its response.

To the extent the trial court erred on the peripheral aspects of its response, any such error was harmless. If the trial court injected some needless confusion by suggesting, contrary to the evidence and the law, that Rivera had or had to have some particular intended target in his crosshairs, that confusion could only have benefited him by requiring the government to prove more than was necessary. That is, it suggested that the government had to prove that Rivera had a particular target in mind when Rivera now concedes that was not necessary. Because any apparent confusion would have inured to Rivera's benefit, we can say with the utmost confidence that any error did not contribute to the jury's guilty verdicts so that any imprecision in the court's response was, at worst, harmless error. *Evans v. United States*, 304 A.3d 211, 231 (D.C. 2023) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

*B. Any erroneous limitation on cross-examination was likewise harmless.*

Rivera next complains that the trial court erroneously curtailed his cross-examination of multiple police witnesses. In Rivera's view, the court cut off a number of valid inquiries into those officers' biases, so his convictions should be reversed.

"The Sixth Amendment protects the right of the accused in a criminal trial to confront and cross-examine adverse witnesses." *Mason v. United States*, 53 A.3d 1084, 1094 (D.C. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). This right "includes the guarantee of 'a full and fair' opportunity to show that the government's witnesses are biased." *Martinez v. United States*, 982 A.2d 789, 794 (D.C. 2009) (quoting *McDonald v. United States,* 904 A.2d 377, 381 (D.C. 2006)). However, the right to cross-examination is not unlimited. Once cross-examination sufficiently satisfies Sixth Amendment requirements, "the trial court has discretion to control the scope and extent of cross-examination." *Parker v. United States*, 586 A.2d 720, 722 (D.C. 1991) (quoting *Reed v. United States*, 452 A.2d 1173, 1176 (D.C. 1982)). "Bias cross-examination of a main government witness is always a proper area of cross-examination and is relevant in assessing the witness' credibility and evaluating the weight of the evidence." *Howard v. United States*, 978 A.2d 1202, 1207 (D.C. 2009) (quoting *Blunt v. United States*, 863 A.2d

828, 833 (D.C. 2004)); *see Scull v. United States*, 564 A.2d 1161, 1165 (D.C. 1989) ("[T]he alleged bias or unreliability of a witness is never a collateral issue.").

Two types of bias are relevant here: currying-favor bias and corruption bias. Currying-favor bias means a witness has "a motive to 'slant his testimony in favor of the government.'" *Martinez*, 982 A.2d at 794 (quoting *Beynum v. United States*, 480 A.2d 698, 707 (D.C. 1984)). For example, "the existence of a[ government] investigation" against a witness—"and the witness's knowledge of it"—provides a motive "to curry favor with the government." *Smith v. United States*, 26 A.3d 248, 262 (D.C. 2011) (citing *Cunningham v. United States*, 974 A.2d 240, 241 (D.C. 2009)); *see also Longus v. United States*, 52 A.3d 836, 851-52 (D.C. 2012). Corruption bias, on the other hand, refers to evidence that shows "a propensity or willingness to thwart the ascertainment of truth in a judicial proceeding." *Longus*, 52 A.3d at 852 (quoting *Bennett v. United States*, 763 A.2d 1117, 1123 (D.C. 2000)). Evidence that a police officer had ever, in any case, tampered with witnesses or had otherwise somehow obstructed justice, for example, would support a corruption bias theory. *Id.*

Rivera specifically argues that the trial court impermissibly curtailed his bias cross-examination of officers when it precluded him from questioning (1) Burggraf about the pending complaint against him that he was seemingly unaware of;

(2) Boone about his pending civil lawsuit and prior failure to timely activate his BWC; (3) Babich about his suspension after he texted non-police personnel about another officer's media appearance; (4) Motley about two previous BWC violations; and (5) Rodriguez about a sustained complaint regarding the hit-and-run.

He raises some pretty strong points. In our view the trial court was overly aggressive in its extensive limitations on seemingly proper lines of bias cross-examination. For instance, take Rivera's desired cross-examination of Officer Rodriguez, who apparently fled the scene after hitting another vehicle in his police cruiser and then failed to report the accident until the owner of the struck vehicle called 911 to report it. While Rodriguez had an explanation for leaving the scene and returning only after the victim's 911 call—he was responding to an emergency that took priority, in his telling—Rivera and the jury did not have to take that explanation at face value. That incident was definitely some evidence of corruption bias that Rivera should have been able to explore on cross-examination. That is, it was some evidence that Rodriguez had displayed a willingness to thwart justice when it served his purposes, and we do not see any proper basis for precluding that line of cross-examination as the trial court did.

Or consider Rivera's proposed cross-examination of Babich, the detective who thoroughly examined the BWC footage from the protest. Babich had texted

non-law enforcement personnel to complain about another officer who was at the scene of the January 6 attack at the U.S. Capitol and was speaking to the media. Babich wrote that "[a]ll [I] know is, don't talk to the media about investigations," especially about "unauthorized" conduct like being a "plainclothes officer" because that hangs your "supervisors out to dry." That also seemed to display some willingness to evade the truth to cover up for fellow police officers, so that the trial court should have afforded defense counsel more leeway in probing Babich's potential corruption bias on cross-examination. *See Longus*, 52 A.3d at 852.

The critical failure with all of these claims, however—as with the previous one—is that even assuming the trial court erred in every respect Rivera highlights, it is exceedingly difficult to discern any harm flowing from the alleged errors. The only serious dispute at Rivera's trial that concerned the misdemeanor APO counts was whether Rivera in fact threw the two T-shaped objects into the group of police officers. If he intentionally did that, it seems inescapable that he was guilty of at least two misdemeanor APOs, which were the only charges he was ultimately convicted of. And Rivera's identity was not established by any of the officers whom he sought to impeach through bias cross-examination—it was instead established by Detective Pelta, the only officer who purported to see Rivera throw the metal objects, and objective video evidence that clearly depicted the man who threw those objects.

The five officers whom Rivera sought to examine further did not offer any meaningful identification evidence. Officers Burggraf and Boone testified primarily about the injuries they suffered, as the severity of them was relevant to the more serious felony charges that Rivera was acquitted of. But their testimonies were largely irrelevant to the misdemeanor APO counts that Rivera was convicted of. Officers Babich, Motley, and Rodriguez served largely to authenticate and narrate various angles of BWC footage. Even if they were entirely non-credible witnesses, and Rivera had succeeded in depicting them as deeply corrupt, the video evidence speaks for itself. To undermine that video evidence you would effectively have to sow some doubt that the officers all conspired to create countless deepfake videos depicting Rivera throwing the objects. And they seemingly would have had to create those deepfakes at a stage of the investigation when they were looking for the suspect—months before Rivera had even been identified when officers created the BOLO from which Pelta had confirmed who she saw throwing the objects—to falsely implicate some random person in the crowd who had not even been identified yet. That is a pretty wild theory that we do not think any reasonable jury could have thought remotely plausible even if Rivera had been given wide leeway to cross-examine the officers about discrete disciplinary infractions and investigations.

In short, none of the officers who Rivera sought to further cross-examine offered meaningful testimony about the only disputed issue relevant to the

misdemeanor APO charges, to wit, whether Rivera was the man depicted in the videos throwing the T-shaped metal objects. Detective Pelta and the objective video evidence established that, and no amount of impeachment of other officers' peripheral testimonies stood any reasonable chance of changing the jurors' minds about that question.[2] *See McGriff v. United States*, 705 A.2d 282, 286 (D.C. 1997) (error was harmless beyond a reasonable doubt where witness's testimony was corroborated by two other witnesses so even if the jury had completely discounted the witness's testimony, the evidence against appellant would have remained just as strong).

### III. Conclusion

For the foregoing reasons, we affirm.

*So ordered.*

---

[2] We assume, for the sake of argument, that the limitations on cross-examination were so pervasive that they rise to the level of constitutional error. Even assuming the exacting harm standard for constitutional errors applies here, we conclude that it is "clear beyond a reasonable doubt . . . that the restricted line of inquiry would not have weakened the impact of the witness[es]' testimony." *McGriff*, 705 A.2d at 286.